## Guyan Chevrolet Co. et al. v. Dillow.

(Decided June 16, 1936.)

DYSARD & TINSLEY for appellants.

JOHN T. DIEDERICH for appellee.

Opinion of the Court by Judge Richardson—Affirming.

This is an action to recover damages for personal injuries alleged to have resulted from the negligent backing of an automobile out of a garage across the sidewalk. On a verdict of the jury in favor of Lizzie Dillow a judgment for $2,500 was rendered against J. B. Rich, doing business under the firm name of Guyan Chevrolet Company, and Avery Smith, the operator of the automobile at the time she claimed she was injured.

They are here urging a reversal of the judgment on the ground the verdict is flagrantly against the weight of the evidence, and is excessive; she was guilty of contributory negligence as a matter of law, and improper argument of her counsel. A disposition of these questions calls for a review of the evidence adduced and the principles applicable thereto.

"On November 28th, 1934, the appellee, Lizzie Dillow, was returning to her home after having visited the offices of relief headquarters in the city of Ashland. She was walking on the sidewalk, along the south side of Winchester Avenue, proceeding in a west direction. As she approached the entrance to the sales room and garage of Guyan Chevrolet Company, the appellant, Smith, was

in the act of backing an automobile from the building, across the sidewalk to the street." * * * Mrs. Dillow "was familiar with the location of the garage, knew it was a garage, and knew that automobiles were continually driven into and out of the garage, and, of course, across the sidewalk to the street."

As she was going down the street on the sidewalk the backing automobile struck her, and as she claims, she "was knocked out," put in the car and taken to Dr. Winan's office. She testified that she did not know whether it knocked her down or not. Her language is:

"Well, I just can say it hit me and I was knocked out and I was put in the car and took to the doctor, who attended me."

She claims that Smith, the operator of the automobile at the place of the accident, stated that "he did not see her"; "did not know she was there." Prior to the accident her health was good; "she did her own work," "walked to town," "washed, ironed, did her own housework and waited on a sick daughter." Her family consisted of five children, and with the help of her little children she did her general housework, including cooking. After she left Dr. Winan's office, she returned to her home, sat down to eat, but could not eat; she walked from the kitchen to a bed and laid down, and "has not since sat up for a whole day"; that "she had been up and down ever since," and occasionally sat in a chair. She testified that she was "hurt through the shoulders and down her side"; her "head, face and foot were injured"; a discoloration appeared on her face and neck; her face and shoulder "became swollen," an she has continuously suffered intense pain in her breast and left shoulder, across her back and in her head, and has become totally and permanently disabled. She has been unable to sleep on account of the condition of her nerves. Prior to her injuries she was in good health and had not been sick, except trachoma in her right eye and an attack of "flu" two years before she sustained the injuries. Dr. Debord was her family physician and had been for 25 years. He was called about 6 o'clock the evening of the accident, which occurred about 2:30, and has continuously attended her as a physician.

Dr. Debord testified that he had been her family physician for about 25 years and had attended her at the birth of her children; had had occasion to observe her health prior to the accident; "it had been good." "Her health had been good for the last four or five years since she had got the family off of her hands,—raised up." "About two or three years ago she had the flue or grip or something like that." After her recovery therefrom, her health was normal. "She was able to work and travel about on the highway." At the time he was called to see her on the evening of the accident he "found her to be suffering a good deal," "in a state of shock." She "had a severe bruise"—"this discoloration continued three or four weeks, treated her with hot applications to reduce the condition of her shoulder." He found an injury "to the side of her face, to her left shoulder and down in the region of the kidney, just above the kidney, seemed to be injured at that time and the left foot also." He has "treated her daily ever since." He testified that at the time of the trial "she suffered with her kidney, or over the region of the kidney." "On an urinalysis," he "found no albumen or sugar, but it showed a chronic kidney trouble." She had an injury in the region of her kidney. Later, she developed "rales" in her lungs, indicating lung trouble which has finally developed into tuberculosis. He stated that since the evening of the accident, "she had not been able to sit up a half hour at the time, and if she does, it starts a temperature and she is troubled with her head." "It seemed like the suffering reached back into the head above the ear." "There is a good deal of swelling there yet, nothing like it was the first three or four weeks after she was hurt." It was his opinion that all of the ailments from which she was suffering at the time of the trial, "dates back directly to the blow, when she was hit." It was his opinion that her troubles were solely attributable to the injuries sustained by being hit by the automobile, and "to nothing else but the injuries." He expressed the opinion that "she would never get well"; that "it had been four months since her injury and her condition had not improved, though cleared up," and that "her injury in the region of the kidney, shoulder and chest had not improved in four months." When he first visited her she narrated

her experience at the time she was injured and detailed how she had sustained the injuries to her foot, head, shoulder, and sides, down in the region of the kidney.

Her and Dr. Debord's testimony is corroborated by Mrs. R. F. Adams, Mrs. Carrie Menshouse, her neighbors, and Miss Birdie Dillow, her daughter, and Dr. J. Cecil Sparks, who examined and diagnosed her ailments. He also claimed that an X-ray picture of her made by Dr. Cooper confirmed his diagnosis.

Avery Smith, the operator of the automobile at the time she sustained her injuries, deposed that as he started to back the automobile out of the garage onto the street, he gave a signal. He was backing it down grade; had his foot on the clutch and the brake at the same time; and "immediately" when he heard "the thud," he "stepped on the brake," and it was his opinion that he did not thereafter move "over a foot at most."

He was asked and answered thus:

"Q. When you looked back where was Mrs. Dillow and just what was she doing? A. She was at the left rear wheel, at the side of the car, and she was straightening her glasses up on her face. * * *

"Q. Then as you came out of the door you could have leaned out and looked back? A. 'Sure,' 'yes, the door is ten feet wide and the car is four or five feet, plenty of room.'

"Q. Did you? A. No. I didn't.

"Q. You didn't see the car strike the woman? A. I did not.

"Q. You feel it? A. I heard the bump on the car."

The automobile was of a ton and a half capacity and weighed 2,900 pounds. The garage entrance was located next to the easterly wall of the garage and extended to the sidewalk. The garage was solid and contained no window or opening other than the front entrance.

Earl Sexton testified that he was in the act of backing out a car in the garage in front of Smith's at the time of the accident. He looked over his right

shoulder and saw a woman before the Smith car touched her; he sounded his horn and he stated that he "thought Smith blew his horn." "She barely touched the side of the car and she stepped back, she didn't go down to her knees." He left his car and went to her and aske~ if she were hurt and she said: "No." He stated that he was not positive Smith blew the horn on his automobile.

O. B. Stafford was in a car in front of the garage. He "thought he heard a car blow," but was unable to say that he did hear it. He looked up and the Smith car was out on the sidewalk and Mrs. Dillow "was just ready to go right into it;" "she did;" "she didn't fall;" "it looked like it just ran over her foot and may have just touched her body;" "it looked like 'a blind spot' on the back end of the car hit about her right shoulder, between the glass and the rear— the side glass and the rear there is a blind spot there—there by that panel—that is a blind spot—that is where they hit—right on that curve there."

Mrs. Joe Mock was at the office of Dr. Winan at the time Mrs. Dillow was carried from the garage to his office. Mrs. Dillow said in her presence that "her foot was numb and had no feeling in it." "She was anxious to get home." "She was among strangers."

The day following the accident, Mrs. Adams called Rich and claims she stated to him that Mrs. Dillow "needed help." The next day instead of affording her "help," he sent Dr. Winan to examine her as a physician. She refused to permit Dr. Winan to examine her.

To overcome the foregoing evidence, substantiating Mrs. Dillow's cause of action and her right to recover, Drs. Winan, Cooper, and Gambill substantially deposed that Mrs. Dillow was not injured at the time of the accident, had not been since, and was not at the time of the trial, afflicted with the ailments described by the testimony of the witnesses in her behalf.

It is obvious that on the evidence, though conflicting only as to the nature and extent of her injuries and their consequences, it would have been improper for the court to have directed a verdict for Rich and Smith.

Rich and Smith concede that " the rule of practice prevailing in this state requires the submission of a

case to the jury if there is any evidence tending to sustain the cause of action alleged, yet if a verdict is flagrantly and palpably against the evidence, the court may set it aside and grant a new trial''; and ''that a verdict may be set aside as being flagrantly against the evidence, and also for another and distinct ground, i. e., that the amount of assessment is excessive.''

Mrs. Dillow recognizes the rule that ''there is no doubt of the duty of this court to reverse a judgment based on the verdict of the jury, when it is flagrantly against the weight of the evidence,'' and also on the distinct ground that the amount of the jury's verdict is excessive.

To substantiate their insistence that a peremptory instruction should have been given directing a verdict in their favor they declare that Mrs. Dillow ''simply walked into the side of an automobile moving at the rate of four or five miles an hour, as it came out of a garage, where the driver had sounded his horn, * * * without even looking where she was going, but on the contrary, looking as she claims to the opposite side of the street''; ''she walked into the side of the car, sounding its horn and another car sounding its horn, to warn her to look what she was doing.''

In support of their view thus expressed, they cite and rely on Straight Creek Fuel Co. v. Mullins, 189 Ky. 661, 225 S. W. 726; Hayden v. Chicago, M. & G. R. Co., 160 Ky. 836, 170 S. W. 200, L. R. A. 1915 C, 181; Wiley v. Cincinnati, N. O & T. P. R. Co., 161 Ky. 305, 170 S. W. 652; McMurtry's Adm'x v. Kentucky Utilities Co., 194 Ky. 294, 239 S. W. 62, and Dailey v. South Covington, etc., St. R. Co., 158 Ky. 64, 164 S. W. 361.

Our pronouncement in those cases was based on facts not even resembling those in the present one. The relation of the parties involved in each of those cases was entirely different from that of Rich and Smith and Mrs. Dillow. Neither of them involved the principles governing the right of a pedestrian to recover of a motorist for an injury occurring from the operation of a motor vehicle on, or about a highway, much less a sidewalk. Therefore, the principles announced in them are inapplicable to the proven facts in the present one. The statement quoted from their brief not only states inaccurately the facts upon which

it is predicated, but it omits the principles applicable and controlling in the present one.

Without pointing out its misstatement of facts, it is required of us to say that the fact she knew the garage was adjacent to the sidewalk on which she was walking, and at the time the automobile hit her was looking away from it, toward the opposite side of the street, did not constitute, in law, contributory negligence on her part. The accepted rule is the mere knowledge of the existence of an offending instrumentality at the place where an injury is suffered does not raise a legal presumption of contributory negligence, unless it further appears that the injured had reason to apprehend danger. Hughey v. Fergus County, 98 Mont. 98, 37 P. (2d) 1035; McCulloch v. Horton (Mont.) 56 P. (2d) 1344. The failure to anticipate negligence which results in injury is not negligence and will not defeat an action for the injury. North Bend Lumber Co. v. Seattle, 116 Wash. 500, 199 P. 988, 19 A. L. R. 415.

The sidewalk which Mrs. Dillow, as a pedestrian, was using at the time she was hit by the automobile, was a part of the street set apart for the use of pedestrians. She had a preferential right to the use thereof over that of Rich and Smith to use it for garage purposes, and when they were so using it, it was subject to her superior right thereon as a pedestrian, with the duty on Smith to exercise ordinary care to avoid injuring her. See cases hereinafter cited.

The term "ordinary care" is a relative one, and the standard by which it is to be measured varies with the circumstances attending the particular case, since care must be in proportion to danger to be avoided and consequences that may reasonably be anticipated. Perumean v. Wills (Cal. App.) 57 P. (2d) 554. Another way of expressing it, is, it was his duty to use such diligence and care as was commensurate and corresponding with the dangerous character of the situation, including the reasonable use of his senses—moving of the automobile at a reasonably slow rate of speed, giving reasonable, adequate warning and maintaining a lookout, though the danger was slight. Roll Osborn & Sons v. Howatt (La. App.) 167 So. 466; Foreman v. Western Union Tel Co., 228 Ky. 300, 14 S. W. (2d) 1079; City of Providence v. Hunter, 231

Ky. 72, 21 S. W. (2d) 135; Blackburn v. Cornette, 220 Ky. 758, 295 S. W. 1046; Ottaway v. Gutman, 207 Mich. 393, 174 N. W. 127; Kropp v. Clem, 210 Ala. 113, 96 So. 865; Minnie Crawley v. Tomkins D. Jermain, 218 Ill. App. 51; Cairney v. Cook, 266 Mass. 279, 165 N. E. 406; Murray v. Liebmann, 231 Mass. 7, 120 N. E. 79; Riebel v. Liddle, 159 A. 407, 10 N. J. Misc. 437; Brandes v. Freitas, 116 Cal App. 459, 2 P. (2d) 830; 12 Blashfield's Cyc. on Automobile Law (Permanent Ed.) sec. 8085, p. 216; Berry, Law on Automobiles, secs. 3.255, 3.256 and 3.257.

The care required by a pedestrian while walking on a sidewalk and in crossing an entrance to a garage or in crossing a private crossing, differs from that required in crossing a street or entering upon the intersection of streets, and in each case is commensurate with the respective dangers involved in the different kinds of crossings.

"Courts take judicial notice that in traveling along the sidewalks of a street pedestrians are oftentimes engaged in thought involving business affairs, domestic troubles, and numerous other considerations which are closely connected with the individual. The ownership of an automobile has become quite common, and with this ownership has become the possession of private garages and private crosswalks, and, in fact, so numerous have these private crossings become that there are few blocks in a city street which do not afford entrances into private property by means of such driveways. The operator of an automobile must realize that, while his use of this instrumentality is sanctioned by law, nevertheless, owing to the great danger to life, limb, and property involved in such use, a degree of care in the operation thereof must be exercised, with the object in view of averting and avoiding by reasonable care injury to others."

Henderson v. O'Leary, 177 Wis. 130, 187 N. W. 994, 995, 24 A. L. R. 942.

In the Foreman and Hunter Cases, the principle is stated that a pedestrian may use a sidewalk as a matter of right and is not required to maintain a lookout for vehicles thereon, whether self-propelled or man-

ually. Also, it is stated therein that a pedestrian is not guilty of contributory negligence if his attention is distracted so that he fails to see vehicles on the sidewalk, as he is privileged to assume that a motorist using it for his purposes will not cross the sidewalk without exercising ordinary care to protect him from injury.

In Riebel v. Liddle it was ruled that a motorist who turned from a street into a driveway without seeing a pedestrian on the sidewalk in front of him until within a few feet of her, and without giving any warning of his intention to turn, until it was too late for her to avoid him, was negligent. To the same effect see Blackburn v. Cornette, supra.

In Brandes v. Freitas the principle is stated that though a motorist backs his automobile out of a driveway and across the sidewalk as slowly as possible, has his head out of the window, yet where he gave no attention to discover the presence of a pedestrian on the sidewalk, he was guilty of negligence. It was also ruled in it that a pedestrian walking with his head down or looking across the street was not guilty of contributory negligence, as a matter of law, in failing to observe an automobile backing out of a driveway, which collided with him as he came into its path.

There is no basis for their insistence that Mrs. Dillow was, as a matter of law, guilty of contributory negligence. Appraising the e v i d e n c e establishing Smith's negligence and her contributory negligence, with the foregoing principles, plainly, if she had asked it, she would have been entitled to a directed verdict as to these issues.

It is true that the evidence bearing on the nature and extent of her injuries, and whether her injuries were so sustained and were the proximate cause of her ailments, was conflicting. Still it was entirely within the province of the jury on such conflicting evidence to determine these questions. The jury having accepted that in her favor, which it had a right to do, it is not within our province to disturb its verdict, unless it is palpably against the weight of the evidence.

The rules defining our duty in determining these questions have been so long established and are so familiar, we do not deem it required to reiterate them.

See vol. 2, Kentucky Digest, Appeal and Error, key 1001 (1) (2) (3).

A summary of the rules stated under this key number is, the law has committed to the jury the question of credibility of the witnesses and the weight of their testimony. And where there is sufficient evidence to establish the issues to which it is offered and the testimony is merely conflicting and it cannot be said that its verdict is manifestly against the weight of the evidence, this court will not substitute its judgment for that of the jury. This statement applies to the question of excessive damages.

It should be admitted that if the testimony showing the extent and nature of her injuries and the direct and proximate result thereof, as described by her and her witnesses, be accepted as true, and it was in the province of the jury so to accept it, the amount of the jury's verdict is not excessive.

Much ado is made in Rich's and Smith's brief of the alleged improper argument of Mrs. Dillow's counsel in his closing address to the jury. If it were our duty to review it solely as it is presenetd in their brief, it might well be said it is within the rule stated in the cases cited to us and relied on by them. The record discloses, however, that the preliminary statement of their counsel to the jury contained a remark to which the objectionable argument was in part a response; also, in the argument on the merits of their defense, their counsel made statements to which a portion of the objectionable argument of Mrs. Dillow's counsel was merely responsive. Viewing such objectionable argument as it is presented by the record and not their brief, the major portion of it clearly falls within the rule that improper argument of counsel of one party made in response to that of the other is no ground for reversal. Evans Chemical Works v. Ball, 159 Ky. 399, 167 S. W. 390; Louisville R. Co. v. Farmer, 182 Ky. 368, 206 S. W. 619.

Aside from this view of the objectionable argument, it is doubtful that it is within the rule stated in the cases cited to us by Rich and Smith, and it is plain that a portion of it falls within the rule stated in Standard Sanitary Mfg. Co. v. Brian's Adm'r, 224 Ky 419, 6 S. W. (2d) 491, since the jury did not re-

turn a verdict for $5,000.00, the snm mentioned in counsel's argument.

The errors complained of, in our view, are not grounds for reversal, and it appearing from the record that Rich and Smith have been accorded a fair and impartial trial, the judgment is affirmed.