# Tucker v. Ragland-Potter Co. et al.

Feb. 28, 1941.

534

C. B. Latimer and Terry L. Hatchett for appellant.

Richardson & Redford for appellees.

Opinion of the Court by Morris, Commissioner—Affirming.

In March, 1938, appellee in suit charged that whilst its truck was being operated on the highway, appellant so negligently operated his car as to cause it to collide with and injure the truck. By answer, counterclaim and cross petition making the truck driver, Alexander, a party, appellant denied negligence and charge gross negligence. A reply denied the affirmative allegations of Tucker's pleading and charged contributory negligence. A rejoinder closed issues.

The jury returned a verdict finding both parties negligent and the court dismissed the respective pleadings. Motion for new trial was overruled and appellant in brief is insisting that the court erred:

(1) In refusing to give peremptory instruction for Tucker since the evidence showed appellee negligent as a matter of law.

(2) In giving an instruction which imposed on Tucker duties not required by law, and another not requiring proper lookout duty, and in failing to require appellee to have proper lights.

(3) In holding that the evidence supported the verdict.

(4) In admitting incompetent evidence.

(5) In consolidating the Carter case with the Ragland-Potter v. Tucker case.

Alexander, an experienced driver, had been driving

appellee's truck for one year; on this occasion he had been delivering groceries at points between Glasgow and Burkesville. After unloading at his last stop, he headed back for Glasgow; the accident occurred about 4 miles from Glasgow. Driving at about 30 or 35 miles down grade he saw lights ahead of him which later proved to be on another car. He first saw the Tucker car when within 15 feet of it; he put on his brakes and tried to turn. He says: "I didn't have any idea of one being on my side of the road in front of me;" that he was traveling on the right side of the road; the Tucker car was standing at an angle across the highway, "over on my side with the back end within two feet of the edge of the pavement on my side," in such position that he could not see Tucker's lights; the lights he saw came from the Ebert car which was facing him; it was a rainy night; the surface of the road was black top or asphalt; Tucker's car was black.

On cross examination, Alexander, while not showing much knowledge as to distances at which a truck could be stopped at any given speed, said that he could not have come to a stop after he saw the Tucker car. He saw the lights from the Ebert car at a distance of 500 yards. He had two feet of roadway (and shoulder) to use in passing the Tucker car but could not travel the shoulder without danger of overturning the truck. The wiper on his windshield was working. He could not "see good" through the shield. The accident occurred between 9 and 10 o'clock.

Tucker, with a companion, was driving out from Glasgow. At the point where the accident occurred, in order to make a turn he drove into White's driveway; misjudging the depth, in starting back one wheel slipped off the driveway and he could not move out on his power. He went to Ebert's home to call a wrecker; Ebert agreed to pull him out, and reaching the point drove up on the right side of the rear of Tucker's car, hooked a chain to its rear bumper, the other end to Ebert's front bumper, and pulled until Tucker's rear wheels caught on firm ground. Tucker then moved back until the front wheels got on hard surface which would put him about 10 feet on the pavement, at about a forty-five degree angle; his car was 14 feet in length. With his car in this position he got out, helped remove the chain, and he, Tucker, put the chain on the running

board of Ebert's car. Tucker then got in his car and "started to straighten it up to get out of the road. I heard something coming, and reached over to let the brake off my car and put it in gear; the motor was running. I got aways back (he does not say how far) in the White driveway, and the truck hit me." He saw the lights on the truck long enough before the impact to reach over and put the car in gear. He insists that his car was on "his side of the road" when the truck hit, and when he first saw the truck it was in the center of the road, "a little bit on my side." The truck hit his car about the handle of the rear door, and knocked it down the road for some distance.

Tucker said he saw the lights first "when Mr. Ebert hollered;" he was then in his car, but would not estimate the distance at which he saw the lights. Tucker's lights were burning but "threw the rays up the road and up on White's field a little ways." He states that all he had to do after he saw the lights was to let his brake off and drive in the White entrance. Tucker later said that when Ebert "hollered" he was getting in the car, and "reached down and got my crutches and put them in and I was about like this." He admitted that he had said on another trial, and apparently adhered to the statement that he did not see the truck as soon as Mr. Ebert did because he "was letting the brakes off and putting the car in gear, starting into the driveway, and looking toward White's barn."

Ebert says there was always heavy traffic on the road. It was asphalt construction; the traveled portion is 18 feet wide near the White barn. The driveway is about 14 feet wide. Ebert describes how he pulled the car out as detailed by Tucker; he backed up the road 87 feet, got on his side of the road and waited for Tucker to turn around. His car was parked 18 inches on the pavement and over on the shoulder, facing the truck. He saw the truck lights before it got over the rise of the hill and about 1,500 feet from where the accident happened. He at once "hollered," "Paul, hurry and get off the road, here comes a car." Tucker heard this warning. Ebert did not see Tucker do anything after he called to him. Further describing, Ebert said, "It came on down; I expected it to slow up. I thought he did not see the Tucker lights; when he got nearly up to the car he seemed to swerve a little. He was in the middle of

the road, Tucker's lights were shining over in the field, not in the direction the truck was coming." The impact moved the car about half the distance from the place of impact to Ebert's car. He says the truck "was traveling mighty fast." He said Tucker had room to pull up in the driveway "about the length of a Ford car," and was not in position to turn when the impact came. The road is straight to the rise of the hill, about 580 feet from the point of accident.

Counsel argues first Alexander was negligent at a matter of law, hence Tucker was entitled to a directed verdict. This contention will be most directly noted in discussing the instructions. As we view the proof, there may have been prima facie evidence of negligence on the part of Alexander, particularly as to driving on the wrong side of the road according to Tucker, but this, with Alexander's evidence, raised a conflict. It would take much time and space to answer each and every contention. A reading of the proof does not disclose such proof of negligence as to have authorized the court to hold Alexander negligent as a matter of law, but presents a case where it was proper to submit to the jury the question of whether or not the injuries resulted from concurrent negligence.

It is argued that it was error to consolidate the Ragland-Potter v. Tucker case with the case of Mrs. Carter, whose husband, an employee of Ragland-Potter, met death in the wreck. As administratrix she sued Tucker for damages resulting to the estate. There had formerly been a trial of the consolidated cases, resulting in mistrial, wherein the court had on motion directed that the cases be heard together. The record before us shows the same order without objection, or motion to set aside the consolidating order on the former trial. Mrs. Carter was called as first witness in her case, but only told of relationship; that she was the personal representative and guardian; testified as to wages and age of deceased; that the child had received two checks for Carter's individual insurance. It was developed without objection that the dependents of Alexander had received compensation.

As we gather, outside the question of relative law, the contention is that the presence of Mrs. Carter and the child had some undisclosed influence on the jury.

Had there been a verdict against Tucker for either of the contestants, there might be potency in the argument. If Mrs. Carter had undertaken to tell anything relating to the accident, it might have been error to admit such testimony, as has been held, particularly in instances where husband and wife testified in separate consolidated actions seeking recovery for tort. That there was no legal disadvantage, see Horton v. Herndon, 254 Ky. 86, 70 S. W. (2d) 975; Herndon v. Kentucky T. &. T. Co., 214 Ky. 36, 281 S. W. 1036, and the recent case of Toppass v. Perkins' Adm'x, 268 Ky. 186, 104 S. W. (2d) 423, in which the Sheetinger [Sheetinger v. Dawson, 236 Ky. 571, 33 S. W. (2d) 609] and Hirsch [Hirsch v. Warren, 253 Ky. 62, 68 S. W. (2d) 767] cases relied upon by appellant are distinguished.

We are pointed to instances of alleged incompetent evidence; one wherein Ebert was permitted to say that for Tucker to have gotten off the highway, "he could have pulled into the passway about the length of a Ford car." This was objected to because calling for an opinion of Ebert, and tended to mislead the jury into the belief that it was Tucker's duty to move entirely off the road upon the approach of the truck. Ebert showed an intimate knowledge of the situation and surroundings, sufficient to qualify him to give expression to the fact. Taking appellant's testimony as a whole, he was of the same opinion.

The court over objection permitted a witness to state that on the morning after the collision he found an empty whisky bottle and an empty soft drink bottle in Tucker's car. Also that a witness testified that when the truck was examined after the accident the speed governor was set at 35. Admitting for the purpose of discussion only that the testimony in each instance was irrelevant, such proof could hardly have affected the verdict. The doctor and nurses who very shortly after the accident attended Tucker made it quite clear as did Ebert that they discovered no signs of intoxication or the use of alcoholic liquors. The mechanic says the governor was set at 35 or 40 but since Alexander admitted the governor would not prevent him from coasting at a speed greater than 35 miles per hour, the question of control by the governing mechanism was of no importance.

Tucker admitted that at the time of the accident he

was using, and could not walk without, crutches, and had a posterior splint below his right knee to keep his ankle stationary, was asked over objection, whether or not he had "had another automobile accident and received a break in the same leg * * * that disabled you for a number of months before this last wreck." He answered, "Yes."

Counsel does not complain of the question insofar as it showed appellant's physical condition, but contends that it was error to inject into the question the words, "in another automobile accident," because manifestly asked for the purpose of conveying to the jury the idea that he was "chronically negligent in the operation of an automobile." We agree that the question was improper, and perhaps asked for an ulterior purpose; but the question is whether or not it could have, under all the circumstances, biased or influenced the jury in considering the question of negligence.

The general rule is that the fact that one has some physical defect in itself will neither bar recovery or fix liability as a matter of law, but may be properly considered as any other fact in determining negligence, and the question is one for the jury. But it has been held that one suing for personal injuries may not be inquired of as to previous remote accidents, since such testimony is irrelevant. Am. Jur. 178-627. For the purposes of this case only, admitting the rule, we are of the opinion that if error, it was harmless. Assuming that the jury was composed of sensible persons, guided by the court's instructions.

Complaint as to instructions relates to Nos. 1 and 6, the first defining the duties of Tucker. It told the jury that it was Tucker's duty "to use ordinary care in the operation and control of his car in backing or having same pulled out on the main traveled portion of the highway, so as to avoid collisions with approaching vehicles, including appellant's truck." The contention urged here is that this portion was highly prejudicial, because the proof showed that at the time Tucker was being "pulled out" there was no vehicle approaching from either direction. But it is not pointed out to us how the use of the words "being pulled out" of the driveway could have misled, or have been misconstrued by the jury. The other portion of the instruction is not

objectionable, since it appears from appellant's testimony that at the time he was struck he was in the act of backing out in order to make his turn. He says that he had pulled "aways" into White's passway, at the time the truck struck him. If he was backing out, or coming out front ways, he assuredly owed ordinary care to not impede the movement of approaching vehicles, and he had been warned of approach in no uncertain terms.

If he was backing out of the passway he owed a relatively higher degree of care than is ordinarily required of operators of motor vehicles using the highway in the customary manner. The standard of care is to be measured by the circumstances and situation attending the particular case, since care must be in proportion to danger to be avoided, and consequences which an ordinarily prudent person might anticipate. Guyan Chevrolet Co. v. Dillow, 264 Ky. 812, 95 S. W. (2d) 796, and cases cited.

The chief vice of the instruction, contends appellant, was in that portion which told the jury that it was the duty of appellant "not to leave his car standing in the main portion of the highway so as to obstruct the free passage of said truck." It is argued that by this part Tucker had no right to have his car on any part of the highway while the truck was passing. Counsel overlooks the words "so as to obstruct the free passage of said truck." Counsel points to Section 2739g-48, Kentucky Statutes, which he says "is for the benefit of traffic moving in the same direction as the parked or stopped vehicle," since "obviously a motor vehicle stopped or parked on its own side of the main traveled portion, day or night, with or without lights, will never obstruct the passage of a vehicle approaching from the opposite direction, operated on its own side of the road." Again appellant loses sight of the proof that at the time of the collision, Tucker's car, according to Alexander, was stopped on the wrong side of the road; that this was the situation may be gathered from the testimony of Ebert.

Counsel insists that Tucker, under Section 2739g-48, Kentucky Statutes, and by reason of the exception, had the right to be in the road with his disabled car; that he was within his rights to use the main traveled portion of the highway, at least his half in removing the

car from the ditch. There may be no question of the soundness of this contention, but counsel had just theretofore argued that Tucker had already gotten his car from the ditch. While he did have the right to use his side of the road, and all the road for making a turn, he was charged with care in so doing. At the time of the collision Tucker's car was moving on its own power. There was no room here for instruction under the statute relating to disabled cars. Bradley v. Clarke, 219 Ky. 438, 293 S. W. 1082.

It is contended that instruction No. 6 was favorable to appellee, and prejudicial to appellant, because it only required Alexander "to keep a lookout ahead," and did not require him to have lights on his truck of sufficient power to reveal substantial objects at least 200 feet ahead. Kentucky Statutes, Section 2739g-24. The accident here, as we view the case, was not due to insufficient lights. The proximate cause, according to Tucker's testimony, was Alexander's use of the wrong side of the road. Alexander tesitfied that his lights showed clearly for a distance of more than 200 feet. They were strong enough for Ebert to see the reflection at 1,500 feet before the truck came over the hill more than 500 feet away when Tucker saw them. Alexander's excuse was twofold, the Tucker car was the same color as the road's surface, and that Tucker's car was in such position at the time that his lights were not visible as he approached. Alexander admits that he was perhaps paying more attention to Ebert's car. His failure to see Tucker's car may have been due more to failure to keep what appellant conceived to be proper lookout, but this question was properly submitted to the jury. There was no evidence that the lights were insufficient, hence the failure of the court to instruction on this point did not constitute prejudicial error. Whitehead's Adm'r v. Knopf's Sons, 262 Ky. 493, 90 S. W. (2d) 709.

The other criticism of No. 6 is that it did not require Alexander to "keep a lookout ahead to observe other persons or vehicles using the highway and to observe substantial objects in the road ahead of him." As we read the instruction it does not convey the idea expressed by counsel. Read as a whole it required Alexander to "keep a lookout ahead," and to operate his truck in a careful manner with due regard to other vehicles that might be using said highway, "and to exer-

cise ordinary care to avoid colliding with other vehicles including Tucker's car.''

It was not essential that the court should have instructed the jury that it was his duty to ''bring the car to a complete stop, if necessary to avoid collision with substantial objects.'' We did say in the case of Rose v. Edmonds, 271 Ky. 36, 111 S. W. (2d) 427, 433, that it was the duty of the driver of a truck to have stopped his car after he discovered the situation there shown, rather than ''continuing his journey and paying no heed to the situation.'' This only meant that the driver of the car, finding himself confronted with a situation of apparent danger to others, is compelled to use available means to avoid the injury. As we note, the instruction in the Rose case, which was approved, does not materially differ in substance from the one given here. A similar instruction was also approved in Abbott Transfer Co. v. Kruse, 272 Ky. 479, 114 S. W. (2d) 731.

We see nothing in either instruction which departed from the law in relation to the duty of the respective drivers. They fairly presented the issues, and no feature has been pointed out which would tend to mislead or confuse the jury.

There is no complaint of the instruction which told the jury its duty if it should believe that both drivers failed to observe imposed duties, and under which the jury found concurring negligence. Insofar as the instructions are concerned, from our viewpoint, they fully laid down the law in regard to duties of the drivers, to the extent that a failure on the part of either might be considered as being the proximate cause of the accident.

Appellant does not put himself in a fair position to criticise omissions from the instructions which as a whole were correct. Counsel offered no instructions save a favorable peremptory instruction, which the court properly overruled. We held in Norfolk & W. R. Co. v. McCoy, 250 Ky. 190, 61 S. W. (2d) 1080, 1081, that if one ''desires an instruction upon any point, he must offer one upon it, and failing to do so, will not be heard to complain.''

From the statement of the facts as detailed, it is apparent that the court did not err in refusing to give the peremptory instruction, or in submitting the case to

the jury. We have already indicated that there was ample evidence to support the finding of the jury; nor do we find substantial error in respect of the other complaints mentioned, hence we conclude that the judgment below should be and the same is affirmed.