96 So.2d 71 (1957)
Gustave E. GUIDRY, Jr., for himself Individually and for and on behalf of minors, etc.
v.
Robert James CROWTHER et al.
No. 4416.
Court of Appeal of Louisiana, First Circuit.
June 4, 1957.
Rehearing Denied June 28, 1957.
Writ of Certiorari Denied October 8, 1957.
*72 Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for defendant-appellant.
A. Deutsche O'Neal, Houma, for plaintiff-appellee.
Adams & Reese, New Orleans, Pugh, Lanier & Pugh, Thibodaux, for defendant-appellee.
TATE, Judge.
At about 1:00 P.M. on July 7, 1954, an Oldsmobile driven by Robert J. Crowther skidded into a Chevrolet driven by Gustave E. Guidry, Sr. Guidry and his wife, a front seat passenger, died as a result of injuries sustained in the accident; and Mrs. Crowther, a passenger in the car driven by her husband, was most seriously crippled. Two other passengers in the Guidry car suffered injuries of lesser severity.
In the five personal injury actions[1] based upon this tragic accident, the substantial *73 question is whether any negligence of Crowther constituted the sole or a concurrent proximate cause of the mishap; or whether, as the District Court held, the sole proximate cause of the accident was the negligence of Roy J. Hebert, driver of a station wagon following Guidry, in imprudently attempting to pass Guidry and pulling out into Crowther's lane and in Crowther's immediate path. It is conceded that no negligence on the part of Guidry contributed to the fatal incident.
The accident in question occurred on U.S. Highway 90 about 3½ miles west of Des Allemands in Lafourche Parish. The District Court aptly summarized its setting as follows:
"The testimony shows with unmistakable certainty that there were only three automobiles in the immediate vicinity of the accident at the time of its occurrence: (1) the Guidry Chevrolet travelling westerly in its own right lane (the south [north] lane of US 90) and driven by Guidry; (2) the Plymouth station wagon driven by Hebert in a westerly direction and approaching the Guidry car from the rear; (3) the Oldsmobile being driven by Crowther in an easterly direction. It is reasonably clear that the accident took place approximately at the foot of a long, gentle curve, that before the accident Guidry and Hebert were travelling westerly in the curve and Crowther was travelling easterly approaching the curve, and that at the point of impact Guidry was about to emerge from the curve and Crowther was about to enter it. In the general area of the accident (that is, at the place of impact and for some distance in either direction therefrom) the highway consisted of an eighteen-foot slab of undulant asphalt with exceptionally narrow shoulders, not more than a foot or two in width near the pavement, that sloped sharply down to the prairie or marsh at the side. * * * At the time of the accident the asphalt was wet as a result of a heavy shower shortly before its occurrence."
Guidry's car, driven at a speed variously estimated as from 30 to 50 mph, was struck and severely damaged in its own lane by Crowther's Oldsmobile. Crowther stated that his own vehicle had gone into a skid crossing the highway into Guidry's lane when, at a speed of from 45-55 mph, he had immediately applied his brakes when the oncoming Hebert station wagon suddenly pulled into his path and alongside Guidry in a rash attempt to pass Guidry as these latter two vehicles were about to emerge from the slight curve.
The principle factual question of this appeal is whether the District Court was manifestly wrong in accepting the testimony of Mr. and Mrs. Crowther that Hebert impatiently pulled out into their path to pass the slower-moving Guidry and drew almost alongside Guidry when the Crowthers were just 150-200' distant; rather than that of Hebert (corroborated in general by the two passengers in his station wagon) that the Hebert vehicle had nosed out when about 300' behind Guidry and, seeing Crowther's Oldsmobile approaching at a terrific speed from the opposite direction about 800-1200' distant, had slipped back, noticing as he did so that Crowther went into a skid because of slipping off onto the shoulder. There were no other living witnesses to the accident, the surviving Guidry passengers having observed nothing thereof.
We see no compelling reason to enter into a detailed analysis of the evidence in this bulky record, so ably and *74 exhaustively analyzed by the lengthy briefs furnished to us by opposing counsel. The trial court's findings of fact will not be disturbed by a reviewing court unless manifestly erroneous, Jones v. Jones, 232 La. 102, 93 So.2d 917, especially when based upon an evaluation of the credibility of opposing witnesses, Fouquier v. Fouquier, 231 La. 430, 91 So.2d 591.
Counsel for appellants most ably argues that it is a mathematical and physical impossibility for the accident to have occurred as the District Court found, accepting the Crowthers' testimony, if the Hebert station wagon (as testified by the occupants thereof) was able to draw to a stop 30-40 feet behind the Guidry-Crowther wreck. Accepting this premise, counsel is able to demonstrate that Hebert must have been a considerable distance behind Guidry at the time that Crowther went into his skid and, consequently, could not have drawn out into Crowther's lane just 150-200' distant from him.
The fallacy of this well reasoned argument is that the only testimony as to this safe stop was given by the occupants of the station wagon. And the District Court specifically found, based on what it found to be deliberate and apparently well-planned variations from original statements given by them to their own insurer,[2] that these three engineering employees were in concert deliberately trying to deceive the court by concocting a version of the accident which, mathematically, would exculpate Hebert, their driver. He found their testimony completely unworthy of belief. We, an appellant could unable to see and hear the witnesses as did the trier of fact, are unable to hold that this evaluation of credibility was manifestly wrong; and we ourselves note that, unlike those particular witnesses, Mr. and Mrs. Crowther consistently gave the same version of the accidentfrom the time the State police drove up a few minutes after the accident, with Mrs. Crowther mutilated and in agony, perhaps dying, Mrs. Guidry dead, and Mr. Guidry dying, right on up through the trial below.
We do not find too impressive efforts made by appellants to discredit Crowther's testimony because he initially reported to the police right at the time of the accident *75 that it was a yellow Plymouth automobile which drew alongside the Guidry car (whereas in truth the Hebert vehicle was a green Plymouth station wagon), precipitating the accident. All parties agree that the only overtaking vehicle involved was the Hebert vehicle, and the precision of observation expected as to such relatively minor incidentals in the few split-seconds preceding a horrible tragedy seems to be unrealistic.
Corroborative of the testimony of the Crowthers that a vehicle drew out into their lane, immediately in their path, almost alongside the Guidry car, is the death bed declaration of Mr. Guidry, lying in the hospital, to a kinswoman, "If it wouldn't have been for that station wagon and those three boys, it never would have happened." (Tr-81.) No objection was made at the time this evidence was introduced.
Whether after the accident Hebert's station wagon actually did stop to the rear of the wrecked carsor whether, for instance, it had passed in its left lane the cars colliding in its right lane before stopping west of the accidentare unknown, the District Court having found to be absolutely unworthy of belief the testimony of the boys in the station wagon, who are the only witnesses able to testify as this vehicle's actions, due to the preoccupation of the other participants in the accident with their own safety and that of their loved ones at the time. There is testimony in the record that Hebert subsequently told a girl friend that he had been involved in the wreck and his vehicle had run into and tapped the Guidry car, although Hebert subsequently told an investigating attorney he had just been "spoofing". Nor, considering the possibilities indicated by the testimony and argument of a slower speed (30 mph) of Guidry as compared to Crowther (50 mph), a quicker reaction time of a passing driver (Hebert) more alert to the potential danger than one (Crowther) confronted with a sudden emergency, and/or a greater braking efficiency of the station wagon used by the surveying crew as compared with that of an ordinary passenger vehicle, etc., would a stop by the station wagon to the rear (east) of the wrecked cars necessarily indicate incorrect the Crowthers' consistent version of the accident as caused by a vehicle drawing into their lane with the realistic intention of passing Guidry in their immediate path and when they were just a short distance away.
But we are not called upon to speculate as to what the station wagon actually did after the accident; suffice it to say that for the reasons indicated, we are unable to accept counsel's argument that the testimony of the boys in the station wagon of their complete stop behind the wrecked cars affords a compelling reason to discard as manifestly erroneous the District Court's factual determination of an attempted passing in Crowther's immediate path.
Appellants' second main line of attack in seeking to hold Crowther and his insurers at least concurrently negligent is the contention that Crowther's speed, under the circumstances, contributed to the accident. Immediately before the accident, Crowther had slowed to a speed of 45-55 mph. U. S. Highway 90, where the accident occurred, was at the time a narrow (18') blacktop highway, with extremely narrow (1') shoulders, slick because of the preceding rain. Based on isolated quotes from the testimony, able counsel attempts to depict this main highway of the State as a thoroughly dangerous thoroughfare, rutted, broken up by potholes, etc. We agree, however, with the District Court that the testimony taken as a whole does not indicate this main highway to have been so primitive as to require a lesser speed than that permissible on other main highways of the State under similar circumstances; although it was certainly not a first class travelling surface at the time due to its relative narrowness and slickness. See Soudelier v. Johnson, La.App. *76 1 Cir., 95 So.2d 39. Defendants' own witnesses uniformly described the speeds of the Hebert station wagon and the Guidry car at 40-50 mph as not unusual, and as prudent and safe under the circumstances; and we fail to see how Crowther's slightly greater speed of 45-55 mph could be considered so excessive as depicted. (The District Court, accepting Mr. Crowther's testimony, found Crowther's speed at the time to be 50 mph.)
However, whether such speed be considered negligent or not, it was not a proximate cause of this accident, which occurred because Hebert pulled suddenly from his own lane into the oncoming Crowther's so close in Crowther's path as to negligently cause the sudden emergency as a result of which this accident occurred, Lanier v. Hartford Indemnity Co., 228 La. 736, 84 So.2d 173, Higginbotham v. Frazier, La.App. 1 Cir., 92 So.2d 89 (Cert. denied), Marler v. State, La.App. 2 Cir., 78 So.2d 26 (Cert. denied). There is a complete lack of any evidence that the application of brakes on a slick pavement asphalt at 50 mph rather than at, say, 25 mph, would have produced any different consequences. A driver is not required to maintain such speed and control as to be able to come to a complete stop when an unexpected and not reasonably to be expected obstacle blocking his lane is thrust suddenly into his immediate path. See Marler case, 78 So.2d 39, Syllabi 8, 9.
Cases such as Geoghegan v. Greyhound Corporation, 226 La. 405, 76 So.2d 412, relied upon by defendants, concern instances where a driver was unable because of his speed, excessive under the circumstances, to avoid hitting objects reasonably to be anticipated in his path; the speed therefore being a proximate cause of the accident. (The Geoghegan case specifically notes that the cows in question "did not suddenly dart in front of a bus", 76 So.2d 413; if they had, any alleged excessive speed would not have been a proximate cause of the accident. Cf., Gautreaux v. Orgeron, La.App. 1 Cir., 84 So.2d 632.)
Nor, as urged in reliance upon such cases as Chouest v. Remont, La.App. 1 Cir., 81 So.2d 568, would a negligent speed by Crowther necessarily bar him from the exculpation of the sudden emergency doctrine; for to bar such exculpation, the negligence in question must have "contributed to the creation of the emergency", 81 So.2d 571. Whether Crowther was going 50 mph or 25 mph, under the facts of this case, the sudden emergency was negligently created by Hebert when the latter pulled out into the latter's oncoming path so short a distance away from him.
Quantum
The present suit was brought by or on behalf of the thirteen surviving children of Mr. and Mrs. Gustave Guidry, Sr. The District Court awarded (1) $15,000 to each of the seven minor children for the damages sustained individually by each child for the sudden death of both their parents; (2) $3,000 for Mr. Guidry's own pain and suffering, which under LSA-Civil Code Article 2315 survived in favor of his minor children only; and (3) $1,249.50 special damages, for the destroyed automobile and Mr. Guidry's hospital bill. Judgment was rendered in favor of each of the seven children who were unmarried minors at the time of their parents' death in the amount of $15,525.46 each; and in favor of each of the six major children in the amount of $96.89 each, being 1/13 of the $1,249.50 special damages.
The special damages are not disputed. Relying upon Keith v. Royal Indemnity, La.App. 2 Cir., 90 So.2d 534, 539, the District Court held that a claim for property damage survived in favor of the decedents' estate, rather than in favor of the specified beneficiaries under Article 2315, LSA-C.C. (which excludes major children when there is a surviving spouse or minor children). However, this court *77 has held that LSA-Civil Code Article 2315 applies even as to such items of damage. Young v. McCullium, La.App. 1 Cir., 74 So.2d 339, cert. denied. Therefore the award in favor of the major children for these items must be disallowed. No answer to the appeal or appeal as to quantum having been entered on behalf of the minors, we are unable to increase their award to allow them recovery of these proven damages.
The award of $3,000 for Mr. Guidry's personal injuries, including a crushed chest, several fractured ribs, and a collapsed lung, and three days suffering in the hospital prior to his death, conscious but under sedatives, does not appear to be manifestly excessive and will not be disturbed.
At the time of their deaths, Mr. Guidry was about 53 years of age, his wife about 46 years of age. Mr. Guidry was in good health, a fisher and trapper (earning $275 to $300 per month during the fishing season). Mrs. Guidry was about 46 years of age and was under medical treatment for carcinoma of the intestine at the time of the tragic accident. They had been married approximately 32 years at the time of their deaths.
The surviving unmarried minor children of the marriage were, with their ages at the time of the accident: Virgie, 20; Nancy, 18; Eulice, 11; Glorine, 10; Gloria, 8; Susie, 5; and James, 3. Virgie married sometime subsequent to the death of their parents. Their oldest brother, Gustave E. Guidry, Jr., qualified as their legal tutor.
The District Court in the following eloquent words described his award of $15,000 to each of the minor children for the death of both of their parents:
"No greater tragedy could befall the surviving children of Mr. and Mrs. Gustave E. Guidry than the instant death of their mother and the indescribable anguish visited upon them by the impending death of their father for four days. If Descartes could have evolved out of his mathematical philosophy a formula to calculate and measure the pangs of grief suffered, it would necessarily have been one of multiplication. The death of one parent to those with strong family ties, as was the case here, is itself an immeasurable loss. But when a family is shattered by the loss of both parents, and a happy home that is the birth-right of every child is obliterated as thoroughly and effectively as though from the impact of an atom bomb, then there is taken from the lives of the children the love and affection for which every human being yearns and the tender care and guidance which builds in youth the character of a lifetime. And no less important are the recollections of a happy childhood, and the reassembly from time to time of the members of the family with their own children at the family home, which even after marriage remains the center, the very capital, of family life. These precious things of illimitable value the Guidry children shall never have, and there shall ever remain a void that will never be filled. No compensation is great enough to repay the loss.
* * * * * *
"Now as important as is the father to the maintenance and supervision of his family, his death can hardly have the same impact as that of the mother. There can be no doubt that the mother is the heart and core of the family. She supplies every need, nurses every wound, consoles every care, and bestows every affection every hour of every day for her children, things that a father cannot do because of his absence in search of a livelihood and things that, because of our very nature he could not offer if he were constantly present. The experiences of *78 life disclose that it is generally loss of the mother, even when she is advanced in years and her children are self-sufficient, that is the source of the most profound grief. Her death, it seems to us, is the greater loss. It is our opinion that there should be judgment in favor of each of seven minors for the death of both parents in the sum of $15,000.00 as prayed for. * * *"
We think this award to be in line with the following cases: Stansbury v. Mayor, etc., 228 La. 880, 84 So.2d 445; Keith v. Royal Indemnity Co., La.App. 2 Cir., 90 So.2d 534; and Bengston v. Travelers Ind. Co., D.C.W.D.La., 132 F.Supp. 512.
For the above and foregoing reasons, the judgment is affirmed insofar as in favor of the seven children who were unmarried minors at the time of the death of their parents; but is amended to reverse the award of $96.88 each to the major children at the time of the death, namely, Gustave E. Guidry, Jr., Clodia Guidry Gaspard, Pearline Guidry Bruce, Percy Guidry, Dudley Guidry and Joyce Guidry Gaspard. The judgment below is affirmed in all other respects.
Amended; and as amended, affirmed.
ELLIS, Judge (dissenting).
In my opinion it is important at the outset to have a mental picture of the situation with regard to the three automobiles allegedly involved in the collision between two of them. On July 7, 1954, Robert James Crowther (hereinafter referred to as Crowther or Crowther automobile) with his wife as a guest passenger were on their way to New Orleans, traveling on U. S. Highway 90, and at the same time and just immediately prior to the collision Gustave E. Guidry, Sr. (hereinafter referred to as Guidry or Guidry automobile) was traveling west approaching the Crowther automobile. In the Guidry car were his wife in the front seat, Oliviera, Jr. and Matherne, two young men as guest passengers on the rear seat. Traveling to the rear of and in the same direction as the Guidry car was a Plymouth station wagon being driven by Roy J. Hebert, an employee of C. H. Fenstermaker, and in the Hebert station wagon as a passenger on the front seat was a fellow employee, Ansley, and on the rear seat another fellow employee, Myers, seated behind the driver Hebert. Thus we see that we have three automobiles, the Crowther automobile traveling generally in an easterly direction, being met by the Guidry car which was in turn followed by the Hebert station wagon traveling in a generally westerly direction. Crowther contends that the Hebert station wagon made an attempt to pass the Guidry car but pulled back and then immediately came out again in order to pass and he, believing that a head-on collision was inevitable, in other words, contending that by this maneuver Hebert created an emergency, he lightly tapped his brakes, went into a skid moving diagonally in sidewise manner, blocking both lanes of travel up to the moment of impact with the Guidry automobile.
The testimony and the incontravertible physical facts will show that immediately after this accident the Hebert station wagon which is supposed to have created the emergency came to a normal and successful stop in its own proper westbound lane of travel, 30 feet from the wrecked Guidry automobile.
It is my opinion and I will try to support it with the testimony and reasons hereinafter given that the Crowther automobile was solely responsible for this collision. All Crowther had to do was to continue in his own lane of travel, and even if he continued at the estimated speed he said he was going, 50 to 55 miles per hour, and which I think was 60 or more, he would not have collided with any automobile. The Hebert station wagon is bound to have been a sufficient distance when it pulled out to see if it could pass, or, if you want to put it, in an attempt to pass, for it not *79 to constitute any emergency unless Hebert actually continued in his attempt to pass, which he did not do when he saw the Crowther automobile and at almost the same time saw it begin to skid down the highway, for he pulled back into his lane of travel behind the Guidry car, safely applied his brakes and came to a stop in his own lane of travel.
There is no question of any negligence on the part of Guidry. He was where he belonged at all times.
Under the well settled general facts which I have above enumerated the law is also well settled. Only recently in the case of Noland v. Liberty Mutual Insurance Co., La., 94 So.2d 671, 673, the Supreme Court with Justice Hamiter as its organ, reversed the Court of Appeal after granting writs. In the Noland case, which is not nearly as strong factually as to the negligence of the defendant, Goudeau, as is the factual negligence of Crowther in the case at bar, Goudeau was driving a bakery truck before daylight, and when about eight miles north of the village of Scotlandville on blacktopped U. S. Highway 61 which is 20 feet in width with four feet of shoulders (Highway 90 in the case at bar was an old blacktopped macadamized highway 18 feet in width with no shoulders and the accident occurred in the daytime when the highway was wet and slick), he suddenly noticed a third vehicle parked partially on the roadway at approximately a 45 angle without lights, flares or other warning signals. He was not sure whether thereafter the truck accidentally swerved into plaintiff's traffic lane or skidded there as a result of his applying his brakes, nevertheless, the Goudeau truck veered into the approaching plaintiff's lane and struck the side of plaintiff's automobile. Under this factual situation the Supreme Court reiterated the well-established law applicable thereto in the following words:
"In view of these provisions, and since the instant collision occurred while the bakery truck was in the wrong traffic lane, the presumption is that Goudeau was negligent in the operation of his vehicle. And it follows that the burden is upon him to show that the accident was not caused by his negligence or that there were justifiable circumstances which would excuse his conduct. See Schick v. Jenevein, 145 La. 333, 82 So. 360 and Miller v. Hayes, La.App., 29 So.2d 396."
Therefore, the burden in this case is upon Crowther to show that this accident was not caused by his negligence or that there were justifiable circumstances which would excuse his conduct. In this I am firmly of the opinion that he has failed.
In order to determine whether Crowther has borne the burden of extricating himself from his prima facie negligence in crashing into the Guidry car in the latter's own proper lane of travel, it is necessary that we examine to some extent the facts revealed by the record. While the record in this case contains approximately 500 pages, the question of liability is one of fact and is solely dependent upon the testimony of Mr. and Mrs. Crowther, Hebert, Ansley and Myers, and, above all, the incontravertible physical facts. The other two living witnesses, Oliviera and Matherne, while credited with making some statements at the scene of the accident, testified that they blacked out and remembered nothing.
On the day in question Robert Crowther and his wife were on their way to New Orleans to see a doctor with regard to a heart condition of Mrs. Crowther. The day was rainy and they were traveling between Des Allemands and Raceland on Highway 90 which it is shown was slick, undulating, subject to holes and ruts, narrow, approximately 18 feet wide with practically no shoulders.
It is shown that as the Crowther Oldsmobile reached a point approximately 3½ miles west of Des Allemands about one o'clock in the afternoon, that the driver *80 Crowther saw the Guidry Chevrolet approaching from the opposite direction, and testified that when he was about "150, 165, 170 yards" from the Guidry Chevrolet, he saw the Plymouth station wagon pull about 2/3 of the way into the lane of traffic in which he was traveling in an attempt to pass the Guidry automobile, and it seemed that then the driver decided that he could not pass safely and pulled back but not completely into his own lane. Crowther immediately took his foot off of the accelerator as he thought it would be a close squeeze for the Plymouth to safely make the passing without colliding with his automobile. Crowther testified that then almost immediately the Plymouth came back out full into his lane of travel and at this time he was "about 55 yards" from the Guidry Chevrolet. Crowther was asked what he did and he stated: "I attempted to slow down. He started by him and it was evident that an accident was inevitable. As I best recall, I tried to slow down as quickly as possible by trying to tap the brake pedal. Having driven on snow and ice I knew that I could expect a skid by jamming the full brake on." It might be appropriate right at this time to mention that this witness as well as others testified to the dangerous condition of Highway 90 as it was constructed of macadam asphalt, was narrow and was wet and slick as a result of the heavy rain and, as Crowther put it, "a good gravel road would have been better." Crowther was a civil engineer and fully realized the dangerous condition of this road and knew the result if he fully applied his brakes. He testified that just prior to the occurrence of this accident he had been going approximately 60 miles an hour and his wife had been complaining about his always being in a rush because of his duties with his employer and she remarked that he might as well start slowing down at that time, referring then to the speed of the car. He stated that at the time he first noticed the Guidry automobile and Plymouth station wagon he was going between 55 and 60 miles per hour, and when asked how much did he decrease the speed of his automobile when he first saw the Plymouth station wagon come out he replied: "It would be hard to say. Five or ten miles per hour possibly." Crowther testified that the moment he attempted to use his brakes the car went into a skid and proceeded diagonally across the highway and struck the Guidry Chevrolet head-on, knocking it in a semi-circle or 180 degree angle, with its front end facing the direction from which it was approaching and his car turned over on its right side with the front portion over the ditch and his wife pinned in the car with her neck or head between the door and the car. It was necessary to dig a hole under her face so that she could breathe. Crowther was "only slightly injured" with a couple of bruises on his ankle and one on his knee, a cut behind his right ear, and became stiff and sore. It is also shown that approximately three miles from the scene of the accident Crowther had passed another car and just prior to his passing he admitted going 60 miles per hour. Very shortly before the accident his wife told him to slow down and he thought he was going about 50 miles per hour at the time the Plymouth station wagon came into their lane the second time and both of them were confident that it was going to attempt to pass the Guidry Chevrolet and that a collision was inevitable. This is the time Crowther attempted to put on his brakes and lost control of his car. Mrs. Crowther very frankly testified under cross examination when asked whether she thought her husband was traveling at a dangerous speed due to the condition of the weather and the road that "as far as I am concerned I would never drive over thirty on a slippery black topped road. As I said before, I am a worrywart." As to the movements of the Plymouth station wagon preceding the accident, which both she and her husband contend was a proximate cause of the accident, she testified:
"A. We were driving down the highway. I noticed a car attempting *81 to pass. I made a comment at that time to my husband about a car trying to pass on a curve. At that time the car went back in its own lane. We assumed he had seen us and was going to stay, and almost immediately he was back and very definitely trying to pass. I saw him approaching the second time and I finally realized we had no place to go and a crash was inevitable. I threw up my arms to protect my face.

* * * * * *
"Q. When this car pulled into your lane of traffic the first time, could you tell us approximately how far it pulled out into the lane, into your lane? A. The first time?
"Q. The first time. A. It was at least a quarter of the car, perhaps up to a half.
"Q. Then he pulled back into his lane? A. Yes, sir.
"Q. What, if anything, did your husband do when this car first pulled into his lane the first time? A. Took his foot off the gas.
"Q. Could you give us any approximation of the distance you were at the time it first pulled into your lane? A. I would say a block, which is three hundred feet.
"Q. Was it in the curve? A. Yes, oh yes.
"Q. After the automobile had pulled back into its lane, had your husband resumed his normal speed or not? A. That would be hard to say. There was a small amount of time involved there.
"Q. In other words, it came out, went back and then came out again immediately? A. Yes.
"Q. Approximately how far was your automobile from this car when it pulled out the second time? A. Now, I go back to my half a block. I use a block as my measurement, so it would be approximately one hundred fifty feet."
Both Mr. and Mrs. Crowther testified that when the Plymouth station wagon pulled out the second time that it came up even with the Guidry automobile, that is, alongside it when it was an estimated distance of 50 or 60 yards from the Crowther automobile. Crowther also stated that he was approximately 40 yards or 120 feet away from the Plymouth station wagon when he started skidding.
A comparison of the testimony of Mr. and Mrs. Crowther shows that it is practically the same.
In addition to the above, there is testimony in the record that Mr. Guidry, who lived until the 10th of July, 1954, is supposed to have made a statement to a third party kinswoman that the Plymouth station wagon was the cause of the wreck. This testimony is pure hearsay. There is nothing to show that Guidry had any idea of the nearness of death. We also have the testimony of the State Trooper who was notified of the wreck by Hebert, driver of the station wagon, shortly after it occurred. His testimony is mainly based upon statements made by Mr. Crowther. At this time Crowther thought the Plymouth was a yellow car and that it had passed by in some manner when the actual collision took place in his opposite lane, however, it is definitely shown that the car he was referring to was the one being driven by Hebert and it was green, and that it successfully pulled back in its own lane of travel and came to a stop some 30 to 40 feet from the front end of the Guidry Chevrolet, after the latter had reversed its position. There is absolutely no testimony as to skid marks or the length of skid marks, which would be of material assistance in attempting to reconstruct a true picture of the distances and speed of the various automobiles involved.
*82 Hebert testified that he, Ansley and Myers, were employed by Fenstermaker to do surveying work, mostly for oil companies; that on the date of the accident he, together with Myers and Ansley, was proceeding from Des Allemands in the direction of Raceland and he first saw the Guidry car in front of him one half or maybe three-quarters of a mile. He came to within approximately 300 feet behind the Guidry car and he pulled out to pass the Guidry car and he saw the Crowther car at this time "1,000 to 1,200, maybe 1,500 feet," from his station wagon, and as he went to cut back he saw Crowther's car begin to go into a spin or skid and at the time of the actual collision or impact between the Crowther Oldsmobile and the Guidry Chevrolet he was approximately 120 feet behind the Guidry Chevrolet and he brought his car to a stop 30 to 40 feet from the Guidry Chevrolet. Hebert testified that he thought the Oldsmobile had slipped off of the narrow black top onto the shoulder just prior to going into a skid and he estimated the speed of the Oldsmobile at 70 or 75 miles per hour.
This witness was questioned about a statement he gave which was not introduced in evidence but has been annexed to the defendant's brief, and his testimony and the statement are consistent on material issues.
Ansley testified that he was riding in the station wagon on the right hand side of the front seat next to the driver, Hebert; that they were traveling to the rear and at approximately the same speed as the Guidry Chevrolet, and he saw the Crowther Oldsmobile when he lifted his head from reading at the time that Hebert pulled out preparatory to passing or to see if the way was clear to pass the Guidry Chevrolet. At this time he estimated the distance between the Crowther car and the station wagon as being 1,000 feet and he estimated the distance between the two cars at 700 feet when the Crowther automobile started to skid. Whether the station wagon went 300 feet in the wrong lane before pulling back is unexplained by Ansley. This witness gave statements in May and February of 1955 and admitted that at that time he had stated that the Crowther automobile was about 175 to 200 feet away when it started skidding. There is no question about this and his explanation for his change was that he had visited the scene of the accident on the same morning he was being questioned at the trial and had concluded he was in error as to distances previously given the adjuster.
It will be noted that the Crowthers contend the Hebert station wagon pulled out twice into their lane of travel in an attempt or to see if it could pass the Guidry automobile. They do state that the second attempt immediately followed the first, however, Hebert and the occupants of his station wagon testified that the latter pulled out one time to see if he could pass and seeing the Crowther car, which according to them immediately went into a skid, he merely pulled back into his proper lane of travel, and realizing the inevitability of a collision between Crowther and Guidry, applied his brakes and stopped the station wagon on its own side of the road an estimated distance of from 30 to 40 feet from the wrecked Guidry automobile. Of course, they testify that they never did pull alongside of or parallel to the Guidry car, but that they were a safe distance to the rear when they pulled out to see if they could safely pass. I am of the opinion that the Crowthers are mistaken when they testify that the Hebert station wagon pulled out twice, for the very simple reason that it was broad daylight, the Crowther car was in plain view, and when they pulled out they saw where the car was and know and are bound to have known and realized the danger of an attempted passing at the time. We realize that the testimony of Hebert and the occupants of his station wagon has been severely criticized by the District Court and necessarily, in adopting the District Court's findings, by the majority in this court, because Ansley and Myers, the guest passengers, gave an adjuster a statement *83 of the estimated distance between the Hebert station wagon and the Crowther automobile at the time the station wagon pulled out, and then changed their estimate of this distance after revisiting the scene of the accident on the trial. The estimate given the adjuster is clearly wrong as will be hereinafter shown by the physical facts which cannot be successfully disputed or questioned in this case. I don't believe any witness should be severely criticized for correcting a patent error. As to whether the changed estimate given on the trial is correct or not is another question.
Myers testified that he was seated on the left rear side of the station wagon behind Hebert, the driver, and he saw the Crowther automobile "* * * Just about the time it went into the skid * * *" and at this time Hebert had already pulled out and "the center line just about split the station wagon as far as I can remember." This witness also stated that the Crowther automobile appeared to hit the shoulder right about the time he saw it start skidding and it skidded diagonally across the road. This witness also gave a statement on February 2, 1955 and May 2, 1955, in which he had said:
"After the wreck and on the way home Hebert said he thought it was his fault by pulling out, but I didn't agree with him."
On the trial he testified that the investigator had gotten the wrong impression of what he had said, however, he admitted that Hebert had asked them when they were riding together after the wreck if there was anything he had done that might have caused the accident but he emphatically denied that Hebert said that something he had done did cause it. The least that can be said for this testimony is that the thought was evidently in Hebert's mind after the accident that possibly his pulling out into the opposite lane had set in motion the action taken by Crowther which caused the Oldsmobile to skid diagonally across the road and into the Guidry Chevrolet.
The District Court gave written reasons as to why it could not accept the testimony of Hebert, Ansley and Myers, which principally was because of the difference in what they told the investigator in their statements of February and May, 1955, and their testimony given on the trial. As previously mentioned, there is practically no difference in the statement given to the investigator by Hebert and the testimony which he gave on the trial. I am confident that Mr. and Mrs. Crowther were in error in their estimates of the distances between the Oldsmobile and the station wagon when they stated it pulled out to pass, at which time they said Hebert's station wagon came alongside the Guidry Chevrolet. If the distance was approximately from 150 to 175 feet as given by them it would have been impossible for the Plymouth station wagon to have gotten back to the rear of the Guidry automobile, which was traveling 35 to 40 miles per hour, and to have stopped some 30 to 40 feet distance from the Guidry Chevrolet in its own proper lane of travel after the collision. This appears self-evident and needs no further explanation.
The District Court reconstructed the accident in accordance with the testimony of the Crowthers in his written reasons and exhonerated Crowther of any negligence. We quote the pertinent portions of the learned judge's reasons on these points:
"If we construct the scene when the Plymouth `pulled out' to pass the Chevrolet, we find the approximate distance between the Plymouth and the Oldsmobile (estimated by Ansley at `175 feet or more') to be less than 200 feet, the estimated distance most favorable to the defendants, Hebert, Fenstermaker and Aetna. At that point the Oldsmobile was proceeding in its own lane at a speed (fixed by Mr. and Mrs. Crowther at 50 miles per *84 hour a short time before the collision, and by Crowther at 5 or 10 miles an hour less at the moment the Plymouth `pulled out') of not more than 50 miles per hour, and the Plymouth was travelling at a speed (estimated by Meyers in his statement of February 2, 1955, at 50 miles per hour, and by Ansley in his statement of February 10, 1955, at 50 miles per hour) of about 50 miles per hour. Thus the Oldsmobile and the Plymouth were each travelling at a speed of 74 feet per second, and approaching one another at a speed of 148 feet per second. If the cars were as far apart as 200 feet at the moment the Plymouth `pulled out', they were then about 1.4 seconds apart. Assuming the reaction time of each driver to have been the average of ¾ of a second, the approaching Oldsmobile and Plymouth each travelled a distance of 55 feet during reaction time, or a total distance of 110 feet, and were then 90 feet or less, or about .55 second apart when braking became effective. This very nearly coincides with Ansley's estimate that the cars were never close together than 100 feet before the impact. (NOTE: The reaction time may have been shorter in the case of Hebert, since he anticipated his own actions and may have been prepared for any eventuality when he ventured out of his lane, while Crowther could not). When the Oldsmobile and the Plymouth were at that moment a distance apart of approximately 90 feet, and an approximate travelling time apart of 2/3 of a second, and the Chevrolet and the Oldsmobile were even closer together, the braking of Crowther became effective, the Oldsmobile went into a skid, and crossed the center line `not over 25 or 30 feet from the Chevrolet' (according to Ansley) and crashed into it. That is the scene that prompted Crowther to say that when the Plymouth pulled out into his lane, `it was evident that an accident was inevitable', and that apparently troubled Hebert's conscience, as reflected by Meyers' statement that `After the wreck and on the way home Hebert said he thought it was his fault. * * *'

* * * * * *
"The defendants contend `that the skidding of the Oldsmobile was of the most immediate proximate connection with the collision of the Oldsmobile and the Guidry vehicle', and that `the excessive speed of the Crowther car was an immediate, vital and necessary element to it having gone into a skid upon a `tap' on the brakes.' This contention, even though it may be true, does not necessarily establish Crowther's action as the proximate cause of the accident. The defendants cite Geoghegan v. Greyhound, [226 La. 405] 76 So.2d 412, and other cases, most of which were referred to and considered in Gautreaux v. Orgeron, [La.App.] 84 So.2d 632, wherein it was held `that if plaintiff Gautreaux's speed was excessive under the circumstances, such speed was not the proximate cause of this accident and of the damage for which relief is sought.' That declaration is applicable to the facts of this case."
We see from the reasons above that the District Court accepted a distance of less than 200 feet separating the Oldsmobile and the Plymouth station wagon when the latter pulled out into the opposite lane the second time to pass the Guidry Chevrolet, however, it must be remembered these same witnesses testified that it ran alongside of the Guidry Chevrolet. The speed used in the above was 50 miles for each automobile. It must also be remembered that the Guidry automobile was moving along at a less speed or approximately 35 or 40 miles per hour when this was supposed to be happening. The District Court says that at the end of the reaction time the two automobiles were approximately 90 feet or less apart or about 65/100 seconds apart when braking became effective, which *85 means that they were still traveling at the moment the braking became effective, together, at a speed of 100 miles per hour. If we accept the distances upon which the reconstruction of the accident was based by the District Court, then as far as the Oldsmobile is concerned it could be accepted as correct, however, it is impossible for it to have happened as reconstructed by our brother below when we apply it to what actually happened with regard to the Plymouth station wagon. In other words, this station wagon would have had 25 or 30 feet in which to stop sufficiently to get behind the Guidry Chevrolet and come to a full stop 30 to 40 feet from the Chevrolet's position after the impact. It will be noted that the District Court made mention that the reaction time may have been shorter in the case of Hebert but it could not have materially effected the answer to his reconstruction of the accident.
It would appear that this is sufficient explanation to show manifest error in the trial judge's reconstruction of this accident. On a good road under good conditions the total braking distance of an automobile at 50 miles per hour is 235.3 feet according to the Lawyer's Motor Vehicle Speed chart. We are not too much concerned with the actions of the driver of the Guidry car for no contributory negligence is plead, however, in one of the statements given by an occupant of the Plymouth station wagon he referred to having seen the brake light go on on the Chevrolet when Crowther started to skid. If this be true it would make it much more difficult and practically impossible for the station wagon to have maneuvered itself to the rear of the Chevrolet and stopped within 30 to 40 feet from its position after the impact all in a distance of 25 feet or 30 feet or 90 feet, although there is no basis to accept 90 feet.
The majority opinion suggests that possibly the Hebert station wagon did not come to a successful stop 30 to 40 feet from the Guidry automobile in its own proper lane of travel but may have continued in its passing attempt and actually passed the Guidry car and the Crowther car subsequent to or at the time of the impact. In my opinion this is absolutely impossible due to the fact that the Crowther car in its skidding blocked both lanes of the highway and, remember, there were no shoulders for any car to get off on. At the moment of impact the position of the Crowther car was such that no car could have passed to the rear of it. It was only after it had struck the Guidry car and knocked it in a clockwise direction 180 degrees that it passed on and the front portion of the Crowther car was off of the black top of the westbound traffic lane with the rear portion still on the black top of the westbound lane. Therefore, for the Hebert station wagon to have successfully passed in the eastbound traffic lane it would not have arrived at the point of collision until after the Crowther automobile had collided and cleared this lane of travel which of necessity would have placed the Guidry automobile much further than the 150 or 200 feet the Crowther automobile skidded before the impact away from the Guidry automobile, and it must be remembered that the Hebert station wagon was only traveling approximately ½ as fast as the Crowther automobile, which would have placed it still further down the road and would completely wipe out any finding of emergency. Crowther and Mrs. Crowther admitted to a speed of 50 to 55 miles per hour just prior to and at the time of the collision, however, I believe that actually Crowther was going not less than 60 miles per hour and that at the time he lightly tapped his brakes that because he knew that with the dangerous condition of the road which was shown to have been wet, undulating and uneven and constructed of macadam which becomes very dangerous when wet, and at his speed that it was impossible for him to use the only safety device on that automobile which would bring it to a stop and avert the collision, viz., the brakes. Of course, I do not think there was any necessity for him to even touch the brakes but I believe that when *86 the Hebert station wagon at not less than 300 or possibly four or five hundred feet distance pulled out to see whether it could pass, it brought the first realization home to Crowther that he was going too fast under the conditions of the weather and road and he therefore decided to slow down. Regardless of whether he was going 50 or 55 miles per hour or faster, he could have continued in his own lane of travel and would have met with no obstruction.
Based on the testimony and the physical facts I am of the opinion that there was no emergency created by the Hebert station wagon and that Crowther has failed to bear the burden of proof necessary to extricate himself from the prima facie negligence imposed upon him by law.
In addition I am of the opinion that the excessive speed of the Crowther automobile under the conditions existing at the time and his inability to use his brakes because of his speed and the conditions of the road, as well as his loss of control due to the simple application or lightly tapping of his brakes was the sole proximate cause of the collision.
The District Court in speaking of the contention as to the excessive speed of the Crowther automobile said that "even though it may be true" but then held under the authority of the Gautreaux case, supra, that the excessive speed was not the proximate cause of the accident. The cited case is not apposite for in that case the Gautreaux automobile had run into a large cane truck. We found there under the facts presented that the unlighted cane truck blocked the entire highway and was so constructed that it "blended into the dark background," and Gautreaux, even had he observed "this long truck parked on the far shoulder or moving slowly in the left lane reserved for traffic coming from an opposite direction, he could not reasonably anticipate the sudden crossing of this long vehicle into his path, and obstructing the entire highway," and Gautreaux "* * * as the District Court held, would have been unable to do so [avoid the accident] even approaching much more slowly. Therefore, plaintiff's speed was not a proximate contributory cause of the accident." [84 So.2d 633.] Thus in the Gautreaux case, the accident having happened "between daylight and dark" and involving an unseeable object, cannot be used as a criterion in the case at bar.
As contended by counsel for defendant in his brief, the courts have consistently held that a reasonable and proper speed must be determined by the facts and circumstances of the case. This is exactly what the law says as contained in LSA-R.S. 32:227 which provides:
"In addition to the specific speed limitations of this Chapter, no person shall operate any vehicle upon the highways of this state at other than a reasonable and proper speed under the circumstances, or at a speed endangering the persons or property of others."
I agree with counsel for defendant's presentation in his brief of the facts and circumstances in this case which convict Crowther of negligence which was a proximate cause or a concurring proximate cause of this collision herein, that is, his excessive speed. Counsel in their brief state:
"We must then consider under what circumstances the respective drivers were operating their vehicles on the date of the accident. The first factor to be considered is the condition of the road and the condition of the weather. There is not one iota of testimony to indicate that the road was in anything but a terrible condition and was considered dangerous even by Mr. Crowther. It was raining at the time, and the highway was wet and slippery. It was narrow, undulating, wavy and broken at the edges, covered with holes, ruts and debris; and, according to Danos, it had other defects. Despite all this, Mr. Crowther openly admits that he was proceeding at a speed of 55 to 60 miles per hour, a *87 speed he considered dangerous under the circumstances. In fact, Mr. Crowther admitted that just prior to the point of the accident he had exceeded 60 miles per hour in order to overtake and pass another vehicle. Sixty miles an hour is specified as the maximum speed limit at any time, on any highway of the state, even under the very best of conditions of weather and of visibility and even where there are four wide concrete lanes. Under the facts of this case, a speed of 55 to 60 miles per hour constituted negligence of the grossest degree.
"The only possible question, therefore, as to Mr. Crowther's liability is as to whether or not his obvious negligence in driving at such an excessive speed contributed to or was the proximate cause of the accident involved in these cases.
"It is hornbook law that regulation of speed by statute or ordinance and the general legal rules as to safe speeds under the circumstances have as their direct object the requirement that a motorist control his vehicle under the conditions prevailing, that he be able to slow or stop his vehicle if circumstances require, and necessarily as part of the foregoing, that he not completely lose control upon an application of his brakes and permit his car to proceed into an opposing traffic lane with resulting danger to other motorists. It should be noted in Mr. Crowther's testimony that he carefully points out that he did not put his brakes on hard, that he `tapped' or `cautiously' applied his brakes, but that, nevertheless, his car immediately started into a gradual skid to his left and across the highway. Although he turned his wheels in the direction of the skid, toward his right, he was unable to bring the car out of the skid, and, accordinglyand this is all according to Mr. Crowther's testimonyhis car, completely out of control, proceeded in a straight line diagonally along and across the highway directly toward the Guidry car. Mr. Crowther repeatedly testified that this skidding continued for a distance of approximately 150 feet down the highway. Just after the Crowther car crossed the center line of the highway, the impact with the Guidry car occurred. We cannot help but submit to Your Honors that this is exactly the result that restrictions and limits on speed, particularly under dangerous, slippery circumstances, are designed to prevent.

* * * * * *
"We submit to Your Honors that a motorist who operates his vehicle at such speed and under such circumstances that he cannot afford to regard the motion of his vehicle, even momentarily, without losing control of it is directly and proximately responsible for an accident such as that here involved. We repeat: Hebert did stop."
Some of the cases cited by defendant in which our courts have held excessive speed under similar circumstances as in the present case to be negligent and, therefore, a proximate cause of an accident are: Singletary v. Kirby, La.App., 39 So.2d 189, in which "the accident occurred on a highway somewhat similar to, but in much better shape than, the one Mr. Crowther was driving on. The road was blacktopped, about 18 feet in width, and was allegedly damp and slick. The plaintiff's car was proceeding at approximately 45 to 50 miles per hour according to the plaintiff's testimony, when confronted with a large truck from the opposite direction pulling out into its lane. These two vehicles later collided, and there was the usual complete conflict in the testimony as to exactly where and how the accident occurred. The Court of Appeal found that the accident which resulted was due solely to the negligence of the driver of plaintiff's car, which went *88 out of control and skidded down the highway and into the truck in question. Although, in some details, the Singletary case is different from the case at bar, the Court's finding on the proximate cause of the accident and on the plaintiff driver's failure to bring his car under control and to reduce his speed is squarely applicable to the present case," and Dupuy v. Godchaux Sugars, Inc., La.App., 184 So. 730, which clearly points out the negligence and proximate causation of an accident by excessive speed and lack of control; and Redden v. Blythe, La.App., 12 So.2d 728, 731, in which the court through Justice McCaleb commented upon the inability of the defendant to apply his brakes at the time he foresaw the possibility of an accident because the roadway was too wet in the following language: "* * * It seems to us that it was imprudent for him, while travelling on a wet road, not to have slowed down immediately to such a speed that he could have applied his brakes with safety. It will not do for him to say that he elected to wait until an emergency was created and that he could not apply all effective means at his command because it was too late. Caution demanded otherwise. His failure to act when he had time to act must be regarded as negligence which had causal connection with the ensuing accident." The estimated speed of the Blythe car by the plaintiff was 50 miles per hour and by Blythe himself as being 40 miles per hour. In either event the court clearly held that it was too fast and excessive under the circumstances, viz., that it was drizzling rain at the time and the roadway was wet and slippery.
The cases cited by the majority are not apposite for the reason that they were based upon the creation of an emergency by the Hebert station wagon and, further, because in those cases there was a stationary object blocking the lane of travel of the plaintiff automobile, which created, according to the facts in each case, an emergency and if the people in those cases had been going 100 miles per hour or 30 miles per hour they could not have avoided the collision, and, therefore, the speed was not a negligent contributing factor in those cases. In the present case, not only was no emergency created but Crowther's lane of travel was unobstructed in sufficient time for him to have safely proceeded because the incontravertible physical facts show this to be true in that the Hebert station wagon did not pass the Guidry car or the wrecked Crowther car but came to a successful stop some 30 feet to the rear of the Guidry wrecked automobile in the westbound traffic lane. Again may I reiterate that had Crowther continued there would have been no collision. I am therefore unalterably of the opinion that Crowther's negligence as above stated, which resulted in the loss of control of his automobile, constituted the sole and proximate cause of the collision, injuries and damages in these cases.
As to quantum I agree in all except the case of Clyde Matherne who suffered an aggravation of a prior knee injury. Due to my views as to liability I will take up no time in detailing the testimony as to Matherne's injury but merely state that while counsel sued for $27,000 the record shows that he attempted to get an agreement or stipulation from counsel for defendants to the effect that a judgment should be rendered in favor of Clyde Matherne for $12,500 which was refused. In view of this fact, together with the testimony, I am of the opinion that $5,000 would be an ample award to compensate young Matherne for the aggravation of his prior knee troubles which he, of course, made worse subsequent to the accident by attempting to play baseball and slide into the bases and on another occasion by falling on some tile in a tourist court at Biloxi.
For the above and foregoing reasons I believe that the judgment should only be rendered against Robert James Crowther and the insurer of the automobile which he was driving as he was solely responsible, and I therefore respectfully dissent from the majority opinion herein.
Rehearing denied; ELLIS, J., dissenting.
NOTES
[1] The present is by the children of Mr. and Mrs. Gustave Guidry, Sr., against (a) Crowther, (b) his liability insurers, (c) Roy J. Hebert, driver of a vehicle overtaking Guidry, (d) C. H. Fenstermaker, Hebert's employer at the time of the accident, and (e) the Aetna Casualty and Surety Company, the liability insurer of Hebert and Fenstermaker. The suits on behalf of the Guidry rear seat passengers were against the same codefendants, Matherne v. Crowther, La.App., 96 So.2d 41 and Oliveira v. Crowthers, La. App., 96 So.2d 96. Mrs. Faith Schack Crowther likewise filed suit for injuries resulting from the accident, making codefendant all of said defendants except her husband and Hebert, Crowther v. Fenstermaker, La.App., 96 So.2d 91. Robert James Crowther filed suit only against Aetna, liability insurer of Hebert, Crowther v. Aetna Casualty & Surety Co., La.App., 96 So.2d 94. All of these opinions are rendered this date by this court. The present opinion discusses the facts and legal issues relating to liability which are common to all five suits, whereas the separate opinions of the other four suits are restricted to a discussion of the damages awarded to the plaintiffs therein. The District Court rendered judgment against Hebert, his employer, and their liability insurer (Aetna) in all suits in which they were parties defendant; and these defendants are appellants herein. All plaintiffs except Crowther appealed devolutively from dismissal of their suits against Crowther and his liability insurers, in the event the appellate courts should allocate liability otherwise.
[2] It should be noted that the discrepancies are not those which sometimes result by the distortions of one person's oral answers as translated into a hostile adjuster's written statement; these statements of February, 1955, taken down by Aetna, their own insurer, amount to a radically different version of the accident than that to which testified. The front seat passenger's (Ansley's) original report was that Hebert nosed out to pass Guidry when the Crowther Oldsmobile was 175-200 feet away; at the trial, he testified to a distance of 700-1100'. The initial statement of this passenger was that Hebert had closed to 25-30 feet in Guidry's rear before pulling out into the lane, and the initial statement of the rear seat passenger was that Hebert pulled into the left lane when just 10 in Guidry's rear to pass; at the trial, the later was unable to estimate the distance, even in terms of 50 or 100', although he like the other station wagon occupants remembered with precision and clarity that the station wagon had come to a full stop 30' behind the wrecked Guidry and Crowther cars. Ansley's testimony at the trial is ambiguous as to whether he repudiated also his initial statement to his own adjuster that Hebert drew up to within 25-30' of the Guidry vehicle before crossing halfway into Crowther's lane; but defendant can draw little comfort if Ansley's testimony is construed so as not to repudiate this initial estimate, for then he flatly contradicts Hebert's version of the accident and substantially corroborates Crowther's. Hebert, a codefendant and alerted by a prior telephone call from counsel for plaintiff, gave a statement more consistent with his testimony at the trial, although he swore that his speed was 40 mph (as compared with the initial estimate in his statement of 30 mph), which if true would tend to increase his distance from Crowther when he pulled out, if he actually had come to a stop as he said he did. It is of course unnecessary to add that we could not conceivably intimate that any part in any intended deception of the courts was played by eminent counsel herein, who are among the most respected in this State for integrity and ability.