## STEGER v. BAYES et al. *
### No. 14897.

Court of Appeals of Louisiana. Orleans.
May 21, 1934.

M. C. Scharff and John J. Conners, both of New Orleans, for appellant.

J. C. Henriques, of New Orleans, for appellees.

WESTERFIELD, Judge.

Plaintiff in this case, William Steger, a captain in the fire department of the city of New Orleans, brings this suit against Harry H. Bayes, a brigadier in the Salvation Army, and against the Salvation Army, his employer, claiming $17,311.15 as damages for physical injuries sustained by him as the result of an accident alleged to have been caused by the negligent operation of a Nash sedan belonging to the Salvation Army and, at the time of the accident, driven by the defendant Bayes.

There was judgment below in favor of the defendants dismissing plaintiff's suit, and the plaintiff has appealed.

On May 17, 1931, at about 11:20 a. m., in response to an alarm, fire engine No. 4 of the New Orleans Fire Department in charge of Captain Steger, and driven by L. J. Muller, an employee, left its station house on Foucher street between Tchoupitoulas and Annunciation streets with the intention of going to a fire. When the engine neared the intersection of St. Charles and Washington avenues, the Bayes car was stopped directly in its path, and in an effort to avoid a collision it turned sharply to the left and ran upon the neutral ground of St. Charles avenue, striking an iron post, with the result that the plaintiff, Steger, was thrown violently to the ground and very seriously injured.

The charges of negligence against defendant Bayes are that he failed to observe the provisions of subparagraph (f) of paragraph 7 of article 1 of section 1 of the Traffic Ordinance 7490, C. C. S., which reads in part as follows: "The driver of a vehicle on the approach of any fire apparatus, shall immediately draw up said vehicle as near as practicable to the right hand curb and bring it to a standstill." And of section 8 of Act No. 58 of 1910, which reads as follows: "Be it further enacted, etc., that the officers and men of the fire department with their apparatus of all kinds, when on duty, shall have the right of way to any fire and in any highway, street or avenue, over any and all vehicles of any kind except those carrying the United States Mail; and any person in or upon or owning any vehicle shall refuse the right of way, or in any way obstruct any fire apparatus of said officers while in the performance of duty, 'shall be punished by fine or imprisonment, and the City Council of the City of New Orleans is hereby directed and empowered to pass all the necessary ordinances to enforce the provisions of this Section.' "

It is alleged that the fire engine had been constantly sounding its gong and its siren in an effort to obtain the right of way from Bayes, whose car, it is said, was about 50 feet ahead of the fire engine and directly in its path for a distance of several city squares before the Washington intersection was reached, but that notwithstanding the evidence of its presence given Bayes by the gong and siren, he persisted in maintaining his course in front of the fire engine, refusing to yield the right of way, and finally stopped suddenly at the Washington avenue intersection, thus creating an emergency which induced the driver of the fire engine to drive upon the neutral ground with the result stated.

Bayes denies that his car disputed the right of way with the fire engine and claims that he did not know of its presence until the fact was called to his attention by his wife shortly before reaching the Washington intersection, and that he stopped at the intersection because of the semaphore signal which is located there showing red and that, when he discovered the fire engine to be in his rear he started his car, turned to the right crossing in front of two other vehicles also parked at that intersection, and proceeded a short distance out Washington avenue in order, as he

claims, to avoid collision with the fire engine.

It seems to us unlikely that Bayes should have refused to yield the right of way to the fire engine. He testified that he had been driving an automobile for 25 years in a number of cities and that he was familiar in a general way with traffic regulations, particularly the necessity for other vehicles to give the right of way to fire apparatus. His occupation, and his conduct after the accident, in doing all he could to aid the injured plaintiff, conveying him to the hospital and calling upon him subsequently to ascertain his condition, is not calculated to give the impression of such obstinate indifference to danger to himself and others as would be involved in contesting the right of way with a fire engine on its way to a fire.

This was the view of the trial judge as appears from the following excerpt from his reasons for judgment: "Captain Bayes has for many years occupied a commanding position in the Salvation Army, a thoroughly reliable man and a straightforward witness. It is inconceivable that a man of this character and training would deliberately force a fire engine to trail him for a distance of six or seven blocks. It is possible that some other automobile did retard the progress of the fire engine down St. Charles Avenue, but I am convinced that it was not the automobile driven by the defendant."

It is admitted that when the Bayes automobile reached the Washington intersection, two other automobiles were already parked there abreast and that the only open space was that which the Bayes car occupied when it came to a stop abreast of the other two automobiles near the neutral ground. The plaintiff contends that the two other cars were stopped in obedience to the signal of the fire engine, but the overwhelming weight of the evidence is to the effect that the semaphore signal had turned red before the Bayes car arrived at the intersection. Consequently, the more likely reason for the two cars to have stopped is that they did so out of respect for the traffic signal. If they had stopped solely for the purpose of according the right of way to the fire engine, they would hardly have parked abreast of each other. If, therefore, the traffic light was showing red before Bayes' car reached the intersection and the fire engine was, as Captain Steger asserts, about fifty feet in the rear of the Bayes car, the signal must have been red when the fire engine was a considerable distance from the intersection.

An independent witness, Mr. Henry Robinson, a member of this bar, who happened to be in a street car on the neutral ground which was stopped at the intersection because of the red traffic signal, testified that when the fire engine was "about two-thirds, or a little more of a block up Washington Avenue near Conery Street" (the street above Washington), he heard the sound of the bell and "looked to see the cause of the alarm, glanced to my left, and saw parked on the corner, or stopped at the corner of Washington Avenue, three cars abreast on the intersection there, and noticed also that the light at that time was red."

Muller, the driver of the truck, and Captain Steger, who was seated next to him, testified that just before the truck reached the Washington intersection the traffic light had changed from green to amber and was still amber when they ran up on the neutral ground, but they are evidently mistaken, for the clear preponderance of the testimony is to the effect that the light was red for some time before they reached the intersection. On this point the trial court, speaking of the driver of the engine, said:

"He should have known that it (the light) would soon turn to red and force him to stop. The witnesses for the plaintiff all testified that it did turn to red, and only differ as to the exact location of the fire engine in the block between Washington Avenue and Conery Street, at the moment that the red light was showing. If my recollection is correct, these witnesses vary from three-quarters of a block from the Washington Avenue intersection to approximately 50 feet. The driver of the fire engine should have had his engine under sufficient control to have stopped at the red light without the necessity of dashing upon the neutral ground."

The record shows that the rules of the fire department compel the drivers of fire engines to observe the traffic signals and prohibits their running over red lights, although the testimony of Captain Steger as to this practice intimates that in certain situations he uses his discretion. He says: "We generally do that (stop) on an amber light, if everything is in the clear; we use discretion all the time. Where there is no traffic traveling opposite to us, when we reach an amber light like that and have a clearance, we go right on."

The speed of the fire engine is given by the witnesses for plaintiff as about twenty-five miles an hour, though the witness Robinson estimates the speed to be forty-five miles.

On the whole our conclusion is that the cause of the unfortunate accident was the

failure of the driver of the fire engine to observe the semaphore traffic signal at the intersection of Washington and St. Charles avenues by stopping his engine, or having it under control as he neared the intersection. We cannot escape the impression that it was the intention of Muller to drive his engine across the intersection regardless of the red light, and that such procedure is not unusual, a very dangerous practice, but one for which we find a measure of justification. We have so long been accustomed to the galloping fire horses of the past and roaring motors of the present, that an impression prevails that the public interest requires the utmost haste in getting fire engines and other fire fighting apparatus to the scene of the fire in order to save public and private property from destruction, and there can be no doubt that prompt and vigorous measures are essential. But, in relieving one dangerous situation, we should not create another and far more serious one. In saving property we should not endanger or destroy human life.

For the reasons assigned the judgment appealed from is affirmed.

Affirmed.