ROLL OSBORN & SONS, Inc., v. HOWATT et al.*

No. 5222.

Court of Appeal of Louisiana. Second Circuit.

April 30, 1936.

*Rehearing denied June 2, 1936.

Barksdale, Bullock, Warren, Clark & Van Hook and E. W. & P. N. Browne, all of Shreveport, for appellant.

Hardin & Coleman and C. B. Prothro, all of Shreveport, for appellees.

TALIAFERRO, Judge.

Plaintiff, an undertaking establishment, doing business in the city of Shreveport, brought this action against defendant and his insurer, the Great American Indemnity Company of New York, claiming $1,173.75 for damages done its ambulance in a collision with defendant's coupé. The acts of negligence alleged by plaintiff are:

(1) Failure to heed the ambulance siren;

(2) Failure to stop or slow down for the intersection within which the collision occurred;

(3) Driving on the wrong side of the street at a reckless speed of 45 or 50 miles per hour;

(4) Failure to keep a proper lookout;

(5) Defective brakes; and

(6) Adjusting radio in car, instead of keeping lookout.

Howatt admits the collision, but contends that it was proximately caused by and solely due to the negligence of plaintiff's driver, in that the ambulance was driven into the intersection at the excessive speed of 60 miles per hour, on the wrong side of the street, and in violation of the traffic light ordinance of the city of Shreveport.

He pleads contributory negligence, and reconvenes, demanding as damages to his car and for the loss of its use, $568.95; and for personal injuries, pain, suffering, and medical expenses, $2,531.00, in all, $3,099.95.

The insurer denies negligence of defendant, alleges negligence of plaintiff, and, in the alternative, pleads contributory negligence of plaintiff in bar of recovery by it.

There was judgment below rejecting plaintiff's demands and in favor of defendant in reconvention for $1,131.18, with legal interest from judicial demand.

Plaintiff has appealed and defendant has answered, praying that the award be increased.

In the city of Shreveport, hospitals do not maintain ambulances. This service, for an appropriate charge, is rendered by

the various funeral homes. That of plaintiff is located on the east side of Fairfield avenue, which runs approximately north and south, in a long block of about 600 feet south of its right angle intersection with Jordan street. Both streets are much traveled main thoroughfares. Jordan is 40 feet wide, while Fairfield has a width of 36 feet. Traffic at the intersection is controlled by a light overhanging the center, which alternately shows the usual colors, green, amber, and red.

At about 5 o'clock on the afternoon of October 8, 1934, plaintiff's establishment received a telephone call for its ambulance to go to Spring and Lake streets, many blocks distant. It was stated that a wreck had occurred there, but no details were given as to who was injured nor how gravely. The ambulance's regular operator, accompanied by a mechanic, immediately drove it out the driveway into Fairfield avenue and turned to the right toward Jordan street. The foot manipulated siren with which the ambulance was equipped was sounded continuously. As the machine gathered momentum and neared the intersection, the driver observed to his left the usual group of cars parked head-in to the several business houses on that side of the street. The last of these, on the corner of the intersection, is a filling station, the front of which allows a view of some distance westerly on Jordan street. Before him he saw two or three cars headed in the direction in which he was going. They were in the right-hand lane of travel and had stopped in the face of the red light. The driver and the mechanic both say that they did not see the light, but it is abundantly proven to have been against them, and it was their duty to see it. Swinging his machine around the waiting cars, he continued without slowing up, at a speed variously estimated at from 25 to 40 miles per hour, into the intersection, ignoring completely the red light. He says that he first saw the Howatt car when it was about 90 feet away from the intersection, coming toward his left, and that Howatt gave no indication of having observed the ambulance. Relying solely upon the sounding siren to protect him from collision, this driver continued to drive the ambulance forward into the intersection. He testified vaguely that he reduced the speed of his vehicle and that it was under control. In this testimony he is not corroborated by the accompanying mechanic or other witnesses. When asked why he did not stop for the red light, he answered,

"It has been customary when the traffic is in such position and such shape, to go through, or on emergency call, with the siren sounding."

We are satisfied, from a consideration of all the testimony, that the ambulance did not slow down at all. It had progressed to the center of Jordan street when it was struck about the left rear wheel by the Howatt coupé, turned over two or three times, and came to rest near the northeast corner of the intersection.

Howatt entered Jordan street on Texas avenue, and when about one block from Fairfield, he was stopped by a freight train passing over a railroad crossing. He was the first away when the bars lifted. When about half a block from the intersection, he saw the green light come on; and as he neared the intersection, he looked each way. He observed one car on Fairfield to his left, and two or three on his right awaiting a favorable light before going forward. Realizing that it was about time for the light to change to red, he had his eyes on the light as he approached the intersection. He neither saw nor heard the approaching ambulance until it was too late to avoid colliding with it. The noise of the freight train was still ringing in his ears; and the radio was playing softly. The light changed just as the collision occurred. He estimated his speed at nor more than 30 miles per hour.

We then have a situation wherein two vehicles approach an intersection and, without material change in speed or direction, continue on to an inevitable collision. Ordinarily, in such circumstances both drivers would be held to be negligent. Howatt relies upon the traffic light ordinance of the city for justification; while those responsible for the ambulance, upon provisions contained in the state traffic laws granting certain privileges to ambulances. The city ordinance, No. 17 of 1926, provides:

"Sec. 2. That when a red light is displayed at any intersection vehicles on the streets along which and on to which it is displayed, shall stop before entering the street intersection, and before passing the property line at such intersection. * * *

"Sec. 3. That when a green light is displayed at a street intersection, traffic shall

move forward into the intersection and on the street along which the green light is displayed. * * *"

There is no special provision for ambulances, but it does ordain that the showing of the amber light in all four directions, accompanied by the ringing of a bell, is the warning of approach of fire or police cars and requires all other traffic to pull into the curb and stop. Even these public vehicles are privileged only when the warning is given by the light itself. This ordinance specifically provides that no vehicle shall ever proceed into an intersection when the red light is displayed, except to make a restricted right turn. Under the terms of this ordinance, Howatt was within his rights in acting as he did, and the ambulance driver was wrong. But no traffic regulation justifies a driver in rushing blindly on his way, heedless of the rights of others.

■■ We find the rule well expressed in the case of Buckley v. Featherstone Garage, 11 La.App. 564, 123 So. 446, 450, in which Justice Odom, as the organ of this court, says:

"Under the traffic light system, a motorist who is proceeding under the proper signal should not be held to that same high degree of care and vigilance as if no such system prevailed. He has the right to assume that the signals are understood and will be observed, and he is not required to anticipate that pedestrians will violate the ordinances and rules and enter a crossing on the wrong signal. The danger at such crossings is less than if there were no such signals, and therefore, less care is exacted. A motorist must use such diligence and care as is commensurate with the dangerous character of the locality. But, even though the danger be slight, he is not absolved from the duty to look ahead."

Howatt did look ahead. The green light was in his favor. Cars on each side had stopped in their proper lanes in observance of the red light facing them. Its change being imminent, he looked up at it as he entered the intersection. Everything that he heard or saw invited him to proceed. He neither saw nor heard the ambulance approaching at high speed out of the usual lane of travel. While many witnesses heard the siren, their ability to do so was not interfered with by the noise of a running automobile as was his. He had no reason to anticipate the approach of the ambulance, and was not delinquent in failing to see and hear that which he was not legally required to anticipate. The record does not support the charge that his brakes were faulty or that he was adjusting his radio, or was on the wrong side of the street at the time of or immediately preceding the collision.

■ All the circumstances, the virtually uncontradicted testimony bearing upon the issue, as well as rational inferences logically flowing therefrom, fasten the responsibility for the accident upon the driver of the ambulance. He was traveling at an unreasonable rate of speed, astride the center white line, as claimed by him, or on the left side thereof, as testified to by several witnesses. In any event, he was not on the right-hand side of the street. He failed to stop for the red light or slow down for the intersection, even after seeing the Howatt car. Unless excused by some special law, there is no justification for his conduct. Mejheardt v. Reboul (La.App.) 158 So. 235; Yee v. Charley Cabs, Inc., (La.App.) 158 So. 261; Geddes & Moss Und. & Emb. Co. v. Dunne (La.App.) 161 So. 211; Steger v. Bayes (La.App.) 155 So. 27.

Plaintiff relies upon the general provisions of the State Highway Act No. 21 of 1932, granting a right of way to cars first entering an intersection over cars coming from the left; and especially upon rule 4(e) of section 3 of title 2 thereof, which exempts public or private hospital ambulances when traveling in emergencies from the speed limitations imposed by the act. This rule specially provides:

"This exemption shall not, however, protect the driver, owner or operator of any such vehicle from the consequence of a reckless disregard of the safety of others."

■ The exemption refers to speed and not to traffic signals. The same title, rule 11, requires the yielding of the right of way to ambulances when on an emergency errand and sounding audible warning. The same title, rule 12(a), requires all vehicles to pull to the curb and stop upon the approach of fire engines, police cars, or ambulances sounding audible signals.

Plaintiff contends that the city traffic ordinance conflicts with the state highway law, and must yield to it. Rule No. 20 of the same title provides:

"Local authorities, except as expressly authorized by this Act, shall have no power nor authority to unreasonably decrease or diminish any speed limitations declared in this Act nor to enact or enforce any rule nor regulation contrary to the provisions of this Act; *except that municipal authorities of incorporated cities, towns or villages, properly authorized and exercising such authority, shall have power to provide by ordinance for the regulation of traffic by means of traffic officers or semaphores or other signalling devices on any portion of the highway where traffic is heavy or continuous.*" (Italics ours.)

The Legislature, evidently realizing the impracticability of reconciling the general provisions of the state highway law with a traffic light system and the dangers and confusion that would result from conflict between them, by the quoted enactment, has specifically removed from the requirements of the general rule that local traffic regulations must yield to the state law in case of conflict, municipal ordinances providing for installation, and regulation of traffic lights. The wisdom of this exception is well illustrated by the following passage taken from the opinion of the learned trial judge:

"The Act of 1932 nowhere deals with the general subject of control of traffic with signal lights, but specifically states that the Cities can do this. It deals with the control of traffic at intersections and other places generally only. The grant of such powers to cities was meaningless, unless it was intended that they should supercede the general traffic rules provided in the Act. If this were not so, under other provisions of the Act, when two vehicles enter an intersection at approximately the same time, the driver approaching from the right shall have the right of way, and another rule that the first vehicle to enter the intersection has the right of way, and this too, without respect to the traffic light. In other words, traffic lights would mean nothing, and the granting of power to the cities to install such a system would mean nothing. We cannot conclude that the Legislature intended any such absurd result. Every part of an act must be construed in relation to other parts, and we think that part of the act dealing with 'right of way' plainly covers the situation only when the city, under the special grant as to traffic lights, has not installed such traffic lights and passed the necessary laws with respect to same."

Failing in its reliance upon the general law, plaintiff is responsible for the damages caused by its driver's violation of the traffic light ordinance of the city.

Howatt demands for permanent, partial injury to his foot, $1,000; pain and suffering, $1,500; and medical treatment, $31. He was awarded $750 for injury and pain, and $40 for medical expenses.

He was thrown against the steering wheel, painfully, but not seriously, hurting his chest. He suffered considerable shock. A blood vessel was ruptured and some ligaments torn in his right foot. He was confined to his room a day and half; used crutches for five days, followed by a cane for two weeks. The foot was taped for a few days and then supported by a leather strap. This was soon replaced by one of elastic, which was worn periodically to the time of trial, April 18, 1935. The foot was still painful at times. He paid out to physicians $31. We think the allowance of $750 for injury and suffering is reasonable; but the allowance for medical expenses must be reduced to $31, as no larger amount is sued for or proven.

Defendant's car was a Rockne coupé, purchased new for $753, in January, 1933. It was in first-class condition, after having been driven 28,000 miles. The only testimony as to its value when wrecked by the collision is that of Howatt himself, that it was worth $675 *to him.* He obtained these estimates of the cost of repairs, one of $341.18 and one of $382.-57. Instead of having the repairs made, he traded the car in on the price of a new one, obtaining for it an allowance of $263. The lower court correctly allowed the amount of the lowest estimate of repairs. Vaccaro v. Favrot, 170 La. 483, 128 So. 284.

It also correctly rejected the claim for the license paid for the new car and the rental value of a car during the period required to repair the old one. Howatt did not rent a car nor have the old one repaired.

For the reasons assigned, the judgment appealed from is amended by reducing its amount to $1,122.18, and as amended, it is affirmed with costs.