TATE, Judge.
At about noon on October 27, 1954, a State ambulance was proceeding south on the Airline Highway, through the outskirts of Baton Rouge, when it ran into a westbound Chevrolet driven by Roy Larson at the Greenwell Springs Road intersection. As a result of this collision, Jack W. Duree, a front seat passenger in the Chevrolet, was killed. The present damage suit is by Duree’s widow, individually and as the tu-trix of the surviving minor child of the union.
Made co-defendants were: The State of Louisiana, through the Department of Institutions, which appeals from adverse judgment; the State’s- liability insurer, which is not a party to this appeal, having paid off its full policy limits subsequent to adverse judgment below; Louis Lang, the State’s ambulance driver, who (not having taken an appeal from adverse judgment) is likewise not a party to this appeal; and Roy Larson and his liability insurer, who are before this Court by virtue of plaintiff’s devolutive appeal from the judgment below insofar as it dismissed plaintiff’s demand against these latter two parties.[1]
The Airline Highway is a main and much-travelled four-lane thoroughfare. Its western two lanes (21.5' in width altogether) are reserved for southbound traffic and are separated by a wide (30') neutral ground from the eastern two lanes thereof (also 21.5' in width) used by northbound traffic. The Greenwell Springs Road is a hard-surfaced two lane thoroughfare, 20' in width. Signal lights control the flow of traffic at the intersection in question.
The right rear of the Larson Chevrolet was struck after it had entered the intersection from Greenwell Springs Road going from the east towards the west, and had crossed the eastern two lanes, the neutral ground, and most of the western two lanes. (The point of impact involving the rear of the vehicle was 5' south of the north curb *858 line of Greenwell Springs Road, 14'3" east of the west curb line of the Airline Highway, and 7'Z" west of the west curb line of the neutral ground.) The front center of the ambulance, which was proceeding south on the western two lanes of the Airline Highway, struck the Chevrolet with such force as to overturn and hurl it 71' southwest of the point of impact, the Chevrolet landing upside down in the ditch.
The chief factual dispute is which of the two vehicles had the favorable green “Go” light and which the inhibiting red “Stop” light, the southbound State ambulance or the westbound Larson Chevrolet?
The applicable law is not in dispute. As specifically noted in the very similar case of Roll Osborn & Sons, Inc. v. Howatt, La.App. 2 Cir., 167 So. 466, under LSA-R.S. 32:247 municipal ordinances within municipal limits regulate the speed of emergency vehicles such as ambulances and their duties with regard to traffic signals; rathe.r than the pertinent State enactments, LSA-R.S. 32:230, 237, subd. F, 238.
The applicable ordinance of the City of Baton Rouge provides that emergency vehicles “shall not drive through an intersection where a traffic signal is exhibiting the signal ‘Red’ or 'Stop’ without first slowing down and ascertaining that such can be done safely and without endangering those who might be in, or entering such intersection, and provided further that drivers of ambulances shall in no event drive same at a speed in excess of forty miles per hour,” Title 11, Chapter 1, Section 6, Code of the City of Baton Rouge adopted September 19, 1951. As in the Roll Osborn case, the ambulance was required to respect the right of way of those who were proceeding across the intersection in obedience to the green “Go” traffic signal in their favor and in reliance upon the red “Stop” traffic signal regulating transverse traffic.
The vast preponderance of the evidence supports the trial court’s factual determination that the ambulance, at high speed, its siren inaudible or just pressed a split-second before the impact, ran the red light inhibiting its entrance into the intersection which the Larson car had almost completed crossing.
That the light was red as to the ambulance and green as to Larson seems certain, and that it had turned green for Larson about six seconds before the impact (when he was 150-200’ from the intersection, and he crossed almost 70' of the intersection at 30 mph, i.e., at 44’ per second) seems equally certain, from the court-accepted testimony (corroborated by surrounding circumstances) of Larson and of a disinterested northbound motorist who had drawn to a stop as the light switched against him and in favor of Larson. By the testimony of the traffic supervisor in charge thereof, the three-cycle lights had therefore been red for approximately 24 seconds as to southbound traffic. Several witnesses,, including Larson, a northbound motorist,, and the ambulance driver himself testified that at least one southbound vehicle preceding the ambulance had stopped at the intersection; and several northbound vehicles were stopped or stopping.
Indeed, with commendable candor the ambulance driver does not seriously deny an adverse light; he merely states that as he approached the intersection slightly slowing from 60 mph to 40-45 mph, the red light flicked to a yellow caution (an impossibility, according to the traffic supervisor, since the caution light always preceded, never followed, the red) and thereupon he accelerated, not seeing the Larson vehicle; immediately following which occurred the fatal accident.
The excessively high speed of the ambulance is indicated by its driver’s testimony, his admission to the investigating police officer at the time of the accident to a speed of 65 mph, the testimony of vir *859 tually all witnesses, and the physical facts surrounding the impact. In extenuation, it should be added that the ambulance was transporting a sick and believed dying child to the State’s Charity Hospital in New Orleans, the oxygen supply was running-low, and the ambulance driver’s mind was upon getting his patient to the destination without delay.
The State further argues that the decedent and Larson, his driver — or at least the latter, so that Larson and his insurer are solidarily liable with it — were negligent in not perceiving the oncoming ambulance or hearing its siren. Although the occupants of the ambulance stated that the siren was blowing, the testimony is virtually undisputed that as to other traffic, the siren was inaudible or not sounding except a split-second or so before the ambulance smashed into the Larson vehicle.
In Kientz v. Charles Dennery, Inc., 209 La. 144, 24 So.2d 292, our Supreme Court had occasion to discuss the relative duties of the drivers at an intersection regulated by traffic signals. Holding that the sole proximate cause of the accident was the negligence of the driver who ran the red light, the Court held that the driver who proceeds into an intersection on a favorable traffic signal “has the right to assume that the signals are understood and will be observed and he is not required to anticipate that pedestrians or other motorists will, in violation of law, enter a crossing on a wrong signal,” for “under the traffic light system a motorist, who is proceeding on a proper signal, should not be held to the same degree of care and vigilance as if no such system prevailed,” 24 So.2d 294. To hold negligent the conduct of a motorist proceeding in response to a favored traffic light, “the courts should be convinced that the dereliction was most substantial,” 24 So.2d 295.
In the Kientz case, as in this, the favored driver had almost completely crossed a four-lane roadway with a wide neutral ground, and the Court specifically commented upon the fact that having done so, “there was no reason for him to believe that it would be dangerous to continue over the short distance of the intersection yet to be traversed,” 24 So.2d 295.
The Kientz case cited with approval the Roll Osborn decision, supra cit., in which the sole proximate cause of an accident involving a motorist proceeding under a favored traffic signal was held to be the negligence of the ambulance driver in running a red light at high speed. It should be added that in the Roll Osborn case the ambulance was struck by the. favored motorist, 167 So. 468, whereas in the present instance the motorist was hit in the rear of his vehicle by the ambulance after almost completely crossing all four lanes and the neutral ground, a circumstance indicating that the ambulance in the present instance was relatively further from the intersection at the time the present motorist entered same.
The following cases also support the District Court’s determination that Larson, a motorist proceeding with the green light, was not negligent in failing to keep a watchout for those who might enter the intersection from the unfavored direction and was not required to anticipate that others would, in violation of law, enter the intersection on an unfavorable light: White v. Travelers Ins. Co., La.App. 2 Cir., 94 So.2d 564; Stevenson v. Williams, La.App. 2 Cir., 76 So.2d 345; Niagara Fire Ins. Co. v. Schouest, La.App. Orleans, 58 So.2d 739; Fitzpatrick v. New Orleans Public Service, Inc., La.App. Orleans, 22 So.2d 473; Seiner v. Toye Bros. Yellow Cab Co., La.App. Orleans, 18 So.2d 189; Clark v. De Beer, La.App. 2 Cir., 188 So. 517, certiorari denied; Saks v. Eichel, La.App. 2 Cir., 173 So. 558 (involving an emergency vehicle, the fire chief with siren allegedly blowing, held to be solely negligent in running the red light); Manuel v. Bradford, La.App. Orleans, 166 So. 657; Buckley v. Featherstone Garage, 2 Cir., 11 La.App. 564, 123 So. 446.
*860 In Calvert Fire Ins. Co. v. Hall Funeral Home, La.App. 2 Cir., 68 So.2d 626, and Hardy v. Daigre-Gilbert Undertaking, Inc., La.App. 1 Cir., 42 So.2d 158, the ambulance drivers were held clearly negligent in equivalent circumstances in proceeding into the intersection; but the favored motorists were held to be contributorily negligent in failing to hear a clearly blowing siren and to take steps to give way if possible, a situation not presented to us by the facts of the present case.
We think the District Court was correct in holding that the sole proximate cause of the present accident was the negligence of the State’s ambulance driver in failing to observe the red traffic light inhibiting his entrance into the intersection and the Larson car crossing same in obedience to a favorable signal, and in holding Larson free of any negligence which contributed to this accident.
That a northbound driver (facing the ambulance) whose attention happened to be directed to the ambulance within split seconds or seconds before the collision, knew at once that an accident was almost simultaneously to occur, does not (despite the State’s able argument) indicate that Larson, who had entered the intersection in response to a favorable traffic light and upon observing that the north- and southbound Airline traffic had stopped or was stopping in obedience to the unfavorable traffic signal, should also have observed same, he being under no duty to expect the continued approach of the ambulance towards the intersection (especially in the absence of an audible siren) — nor does it prove, if Larson had observed the ambulance at the same time as the motorist did, that he had the physical opportunity to avoid the accident: At his speed of 30 mph (44' per second), Larson’s front had completely crossed the intersection (70'), in seconds.
We likewise do not find merit in the State’s contention that the State’s employee, driving the State’s ambulance at the time of the accident, pursuant to the orders of his superiors in the State's service, was not at the time within the course and scope of his employment. We think such a showing to be sufficient to render the State liable for the negligent acts of its employees, when legislative authorization to consent to suit against the State has been granted, as is any other employer under Article 2320, LSA-C.C.
The State again urges on appeal its preliminary exceptions, overruled below, to citation, to jurisdiction ratione materias, of misjoinder, of no right and cause of action, and of the unconstitutionality of the legislative authorization for this suit.
The plaintiff joined the State as a party to this suit by virtue of House Bill 387 of the Regular Session of 1956, which was passed by both houses of the Legislature, but which was vetoed by the Governor. Legislative consent to suits against the State is authorized by Article 3>, Section 35, La.Const., LSA. Such enactments should be liberally construed to accomplish the legislative intention. Lewis v. State, 207 La. 194, 20 So.2d 917, St. Julian v. State, La.App. 1 Cir., 82 So.2d 85, and authorities therein cited.
 The State’s exceptions to citation and to jurisdiction ratione materias are essentially based upon the alleged invalidity of the statutory authorization to suit against the State “through the Department of Institutions”, and of the service upon “the State of Louisiana through. * * *• Dr. Edward D. Grant, Director of Institutions and/or Director of the State Dept, of Hospitals.”[2] The legislative authoriza *861 tion provides that the State should be served or cited through the Governor, Attorney General, and “the Director of the Department of Institutions of the State of Louisiana."
The State’s argument is chiefly based upon the assertion that the constitutional designation of the corporate body exercis-' ing administrative functions over State institutions such ás that employing the tort-feasor in the present action is “The Louisiana Board of Institutions"; Art. 6, Section 30, as ratified by the people of Louisiana in the November 1952 general election. But like the “State Board of Education” with its constitutional function of supervision and control over public educational facilities and institutions, Art. 12, Sections 4, 6, La.Const., whose operating functions are performed by a “department of education”, LSA-R.S. 17:6; and the Board of Highways, with general control over the State highways, Art. 6, Section-19.2, La.Const., the operational arm of which is the Department of Highways, Art. 6, Section 19.2(7), LSA-R.S. 48:11.-21; the work of the Board of Institutions is performed through what is referred to as the “department” in the constitutional provision creating the Board of Institutions itself, cf. Art. 6, Section 30(4), subds. 10, 11, and as the “Department of Institutions” in various legislative enactments concerning it, see, e. g., LSA-R.S. 3:1103, 15:867 (see title of Act), 28:445, 28:562 to 28:566, 46:1304.[3]
The constitutional provision regulating legislative authorization of suits against the State does not -require that the State should be cited only through constitutional boards and not through operating departments created by the administrative boards or by the legislature. It is only required that the authorization “shall provide the method for citing the State” without requiring service through any particular governmental agency, Art. 3, Section 35, La.Const.; although usually to facilitate notice of the suit to the appropriate agency, the special acts require the State to be served through same. The State was served through its “Department of Institutions” in the following recent cases of this Court, Webb v. State, 91 So.2d 156, Green v. State, 91 So.2d 153, and St. Julian v. State, 82 So.2d 85. Cf. also, Day v. Department of Institutions, 228 La. 105, 81 So.2d 826.
Likewise, we regard as an immaterial variance, and as sufficient compliance with the legislative provision for citation in this suit, the service and citation of the State through the Department of Institutions through the Board (and Department) of Institutions’ executive officer, in his constitutional title of “Director of Institutions”, Art. 6, Section 30(5), rather than as “Director of the Department of Institutions” as described in the legislative authorization: for among other reasons, the “Director of the Department of Institutions” is. *862 also officially denominated as the “Director ■of Institutions.” No complaint is made of the additional citation of and service upon the State through the Attorney General and the Governor, as additionally provided for by the legislative authorization of this suit.
For these reasons, and also because it is well settled that the constitutional provision only requires legislative consent to the suit against the State without necessity ■of approval by the Governor, Jefferson Lake Sulphur Co. v. State, 213 La. 1, 34 So.2d 331, we cannot accede to the State’s argument that the Governor’s veto bars the present suit authorized by the legislature, ■or that the Act is unconstitutional because ■of these circumstances.
The State’s exception of misjoinder is based upon the joining of the State as codefendant by amended petition with other ■defendant alleged tortfeasors or liability insurers, against whom suit had earlier been filed to interrupt the peremptive year. It is argued that the special act conferring legislative consent to this suit did not authorize this. We think plaintiff-appellee ■correctly answers this argument by pointing to the provision in the constitutional ■section regulating legislative consent to ■suits against the State, wherein it is stated: * * * The procedure is such suits, except as regards citation and original jurisdiction, shall be the same as in suits between private litigants. * * * ” Art. 3, Sec. 35, La.Const.
The exceptions of no right and -no cause of action were likewise, we feel, ■correctly overruled by the trial judge. The allegations of the petition amply show negligence on the part of the State’s ambulance ■driver, and Articles 19 and 36 of the petition allege that such employee was operating the ambulance as the agent and employee of the State Institutions agency, for whose acts of negligence the State was responsible. We think this adequately ■states a tort action and the facts by which the State was liable as the tortfeasor’s employer, Articles 2315, 2320, LSA-C.C.; and, as stated, the proof shows that the employee was acting in the course of his employment as directed by his superiors. In St. Julian v. State, 82 So.2d 85, certiorari denied, we discussed and found untenable the argument (again urged before us herein) that the State is immune from liability herein since the negligent act was committed in the performance of a governmental rather than a proprietary function. By virtue of enactments pursuant to Art. 3, Sec. 34, La.Const. the legislature waives, as it did here, not only the State’s immunity from suit, but also its immunity from liability. See also Marler v. State, La.App., 2 Cir., 78 So.2d 26, certiorari denied.
Aside from special damages, which are not contested, the District Court awarded plaintiff, widow of Jack W. Duree, individually $60,000 for loss of her husband’s future earnings, and $10,000 for loss of his “love, affection and companionship”. Additionally as tutrix of and for the use and benefit of the minor child of the marriage she was awarded $15,000 for the minor’s loss of the future earnings and the support of her deceased father, and the further sum of $5,000 for the minor’s loss of her father’s love, affection, and companionship.
The State, appellant urges that these damages are excessive. Plaintiff has answered the appeal, requesting that the awards be materially increased.
At the time of his death, decedent was 29 years of age, and had a life expectancy of 36.03 years according to the American Experience Tables of Mortality, introduced in evidence without objection. (At the time of decedent’s death, plaintiff, his widow, was 27 years of age, and their only child was six years of age.) The evidence shows that he was in good health, a very active young man, and an outstanding success in his occupation as a senior salesman for the National Cash Register Company. The evidence further shows a happy and contented home, to which he was a good husband and father.
*863 The award of damages for personal injury or death is of necessity somewhat arbitrary; loss of the love, companionship, support (both spiritual and financial), understanding, and guidance of a good father and husband has no monetary equivalent. While the damages should be compensatory of the loss sustained, Article 231S, LSA-C.C., in cases such as the present, where the damage is certain but of uncertain pecuniary value, much discretion must be left to the trier of fact, Article 1934, subd. 3, LSA-Civil Code, and many cases cited thereunder. Although awards so made may vary greatly with the facts of each case, likewise they should be made with some degree of uniformity with those made for similar losses. See, e. g., Higginbotham v. Frazier, La.App. 1 Cir., 92 So.2d 89.
 In accordance with these principles, we find to be within the discretion of the trial court the awards of $10,000 and $5,000 respectively to the widow and child of decedent for loss of his love, companionship, and affection, which are neither manifestly excessive nor manifestly insufficient. In Marler v. State, La.App. 2 Cir., 78 So.2d 26, certiorari denied, an award of $10,000 for this item was made in favor of a 50-year widow. See also Stansbury v. Mayor, etc., of Morgan City, 228 La. 880, 84 So.2d 445; Guidry v. Crowther, La.App. 1 Cir., 96 So.2d 71; Keith v. Royal Indemnity Co., La.App. 2 Cir., 90 So.2d 534; and Payton v. Great American Indemnity Co., La.App. 2 Cir., 83 So.2d 575. We may add that we do not find that the District Court abused its discretion by lumping within this award such items, for which separate damages were itemized by the petition, as the loss of guidance by the father and the loss of the father as the head of the family.
Likewise, it appears to us that in accord with the Marler case, in which writs were denied by the Supreme Court, and with the principle of allowing compensatory damages (having due regard for the discretion of the trier of fact), were the District Court’s allowance to the widow of $60,000 for loss of her husband’s earnings and to the minor child of $15,000 for loss, of his support and his future earnings.
Decedent was a young man of proven financial success, with an apparently stable and expanding future before him. His net earnings were substantial and were increasing, and until his unfortunate demise his family seemed assured of a secure and comfortable, as well as happy, future.
In the Marler case, relying upon Jones v. Kansas City So. Ry. Co., 143 La. 307, 78 So. 568, faced with the same problem of giving a present monetary value to the wife’s share of the husband’s future earnings, our brethern of the Second Circuit first calculated his estimated future earnings by multiplying his annual earnings of $5,000 by his life expectancy of 13]4 years, arriving at a figure of $67,500; then, discounting same at the rate of 5'%, and assigning the widow a one-half interest in the discounted balance, an award was made to her of $30,000 for her share in the decedent’s community earnings.
In the present case, we have a young man of 29 years of age and a record of constantly increasing earnings. His life expectancy was 36.03 years. His actual earnings at the time of his death were $900 per month, or over $10,000 per year. The State argues that the gross figure to be used in computing this loss should be $650 because the petition’s allegations had alleged his monthly earnings to be “more than $650.00”. If so, this loss of earnings still totals a minimum of $7,800 per year during a life expectancy of over 36 years. This would amount to a gross loss of future earnings of $280,000.
But were the beneficiaries to receive immediately in a lump-sum this gross loss of future earnings which would have (but for the death of the wage earner) been spread over many years, as a mathematical proposition the beneficiaries would receive in present monetary value far above the pecuniary value of these future earnings. *864 They would receive the substantial value of the use of the money (that is, the interest thereupon) for many years before they would actually have received said ■earnings in the normal course of events. It is for this reason that the Jones and Marler cases discounted the lump-sum to its present worth roughly by calculating the gross amount of future earnings at the rate of interest (or discount rate) used, so •as to calculate the amount needed to purchase the given annual income for the appropriate number of years for the beneficiaries through the interest earned thereupon (at the rate used) together with the annual withdrawals from the diminishing balance of the award.
“By the great weight of authority, where •the damages to be awarded for wrongfully •causing the death of a person are compensation to the designated relatives for their pecuniary loss, both immediate and prospective, so far as the loss is prospective, the gross amount thereof should be reduced to its present worth. The measure of damages is, therefore, commonly stated as the ■present value, to those entitled to recover, of the reasonable expectations of pecuniary advantage which they have lost by his •death.” 16 Am.Jur. 138, “Death”, Section 202.
There is no expert or actuarial evidence in the record as to the average percentage •of the income to be assigned to personal expenses of the head of a family of three, nor as to any current discount rate by which can be calculated the current cash value to be assigned such gross loss of earnings. In the Jones case, our Supreme Court from the evidence deducted 30% of decedent’s gross wages for his estimated personal expenses, and discounted the balance (to reach the present cash value) at the i/iew-current investment rate of 5%..
In the recent federal case of U. S. v. Guyer, 4 Cir., 218 F.2d 266, faced with the identical problem, the court deducted one-third of the decedent’s annual earnings for his personal expenses, and used a discount rate of 3(4%- — from decedent’s gross annual earnings of $7,500 was deducted $2,500 for his personal expenses, and this net earnings for his life expectancy of 26.84 years, discounted at 3)4% (calculated as the earning power of money in 1954), produced a net loss of his earnings to his widow and children of the $87,500 awarded. It was specifically noted that the decedent therein was not a man of high earning power. See also New York, N. H. & H. R. Co. v. Zermani, 1 Cir., 200 F.2d 240, where an award to the widow and children of a 39-year old man whose life expectancy was 30.10 years and whose annual earnings for the year prior to the accident were $5,406.-56, was affirmed at $116,500.
We do not mean to suggest that there is any formula that must of necessity be adopted in calculating the estimated future earnings of a deceased wage earner. There are so many imponderables involved, including the ages of the decedent and his spouse. The decedent’s potential earning capacity irrespective of his present (if not purely speculative); the possibilities that despite his life expectancy his full span might not have been allotted to him or that his present capacity might not have been sustained; the possibility that Life, the Great Healer, might mitigate the loss by the young widow of his help and companionship and his earning capacity; the impact of the federal income tax both upon the net “take-home” pay upon which the loss is measured, and upon the income from the sum awarded which (with amounts drawn from the decreasing balance) is supposed to approximate the loss of the decedent’s earnings to the beneficiaries resulting from the decedent’s death; the variable discount rates possible; the variable percentages to be deducted from future earnings by reason of the decedent’s estimated future personal expenses — all these and many more to be imagined, while too speculative to justify specifically defeating or reducing or increasing the award for each *865 such item, are factors which the court with discretion to award damages may properly take into account.
So, in the present case, the function of this appellate court is not to set out a rigid formula into which, like “Univac”, can be fed all the infinitely variable and immeasurable factors affecting the award of the damages to the decedent’s wife and infant daughter through loss of his earnings, to arrive at the precise and immutable answer as to the present worth thereof. It is rather, against the contentions of the State that the award was excessive and of the appellee that it was inadequate, to ascertain whether, under the pleadings and facts of this particular case, the District Court abused its discretion by its award.
The evidence undoubtedly reflects that during the last year of his life decedent’s net earnings were slightly over $900 per month. Because plaintiff had alleged that the decedent’s earnings were “more than $650.00 per month” (Article 2 of petition) and prayed for an award of $234,000 for “Loss of future income from her husband’s earnings, calculated on an earning span of 30 years $650.00 per month” (Article 27), the State urges that calculation of the ap-pellee’s loss should be restricted to the monthly rate of $650, from which it is suggested that there should be deducted, for example, the possibilities of future reduction thereof, the decedent’s personal expenses, his prospective income tax liability, etc.
Contrariwise, appellee suggests that the figure of $900 should be used since, nevertheless, the figure arrived at would be within the gross amount of loss of earnings for which recovery was demanded, and since this result is permitted under the liberal rule of pleadings, the allegation being that decedent’s earnings were “more than- $650.00 per month”. Further, appellee points out that the evidence indicates that the decedent’s earnings of $900 per month reflected a career of continually increasing earnings, and that thus the widow lost not only his income at the time of death but the prospects of a continuing rise in income. Ap-pellee also points to the continuing decline of the value of the dollar over the course of history.
We do not pretend that the impressive contentions of the opposing parties can be equated or weighed with any degree of exactitude. We can simply point out that, even accepting net earnings of $900 per month to the decedent, at the time of his death, his “take home” pay after deduction of federal income tax would be $760 per month,[4] and that perhaps balancing this highest year of decedent’s earnings in a time of record prosperity with the possibilities of gain or loss in the rate thereof, it would not have been an abuse of discretion on the part of the trial court to calculate the loss of decedent’s future earnings or “take home pay” to his beneficiaries at the net rate of $650 per month throughout his life expectancy.
If this were done, the decedent’s minimum loss of estimated future earnings is $280,000, that is, at $7,800 per year, during his future life expectancy of 36 years. Using Lake’s Monthly Installment and Interest Tables (5th Ed.; 1950), p. 230, Part V “Present Value of $1 due 1 to 50 years: Compound Discount Table”, and discounting same at five per cent as was done in the Marler case, we arrive at a present value of this estimated future income as of $129,065.50. If as in the Marler case we assign decedent’s personal expenses to his own half of these earnings, the present value of the widow’s community half of these estimated future earnings is slightly *866 more that $64,500. The District Court awarded her $60,000 for this item.
Likewise, if for instance one-third of the total value of these future earning's ($129,065.50), or $43,021.84, is deducted from his half of the community earnings as his estimated future expenses, the net balance is still slightly more than $20,000 loss of future earnings for his minor and only child. The District Court awarded $15,000 for the use and benefit of the minor for the loss of support by and of the future wages of her father, the full amount demanded by the petition for this item.
Taking into account all the variables involved, and upon the basis of the present record and of the jurisprudence, we are unable to say that the District Court erred in these awards.
Counsel for plaintiff-appellee correctly urges that amounts received by her from life insurance and social security benefits are not available to the tortfeasor as credits against this award. At 16 Am. Jur. 151, it is stated that “it is well settled that the amount of recovery for death by wrongful act is not diminished by the receipt of any of the beneficiaries of the action of money paid by an insurance company on a life or casualty insurance policy”, Section 223, nor is such award “diminished by the receipt of a pension by any of the beneficiaries of the action,” Section 222. See also deRoode v. Jahncke Service, Inc., La.App. Orleans, 52 So.2d 736 (syllabus 5), 25 C.J.S. Damages § 99, p. 647, Section 99, 15 Am.Jur. 617, “Insurance” Section 201.
Finally, the State urges that the District Court erred in awarding legal interest from date of judicial demand upon the amounts awarded, arguing that LSA-R.S. 13 :4203 providing for such interest on judgments in damage suits does not apply where the State is defendant. This contention of the State was specifically overruled in Reeves v. State, 232 La. 116, 94 So.2d 1. See also Tucker v. State, La.App. 1 Cir., 91 So.2d 56.
For the above and foregoing reasons, the judgment of the District Court herein is affirmed in all respects.
Affirmed.

. Decedent’s employer’s compensation insurer intervened upon its subrogation claim for workmen’s compensation paid decedent’s widow; however, since after trial this claim was paid in full (apparently from the proceeds paid by the State’s liability insurer), likewise this intervening insurer is not a party to this appeal.

. By Act 207 of 1956, LSA-R.S. 40:2001 et seq., the East Louisiana State Hospital ■ — an employee of which institution (then under the jurisdiction of the Board or Department of Institutions) was the tortfeasor in the present suit — was transferred from Institutions to the State Department of Hospitals. The State urge» *861 that the legislative authorization was only as to suit against the State through the Department of Institutions, and not against the State Department of Hospitals. If so, the alternative designation in the citation may be regarded as sur- - plusage.
We do not find persuasive the State’s further argument arising from this circumstance that since the East Louisiana State Hospital was subsequent to the accident transferred from Institutions to Hospitals, legislative authorization should have been obtained to sue the State through the latter instead of the former; not only because we are cited to no constitutional or legal authority for this ñot-necessarily sequent proposition, but also but because we think the plain legislative intention of the act was to authorize suit arising out of the accident in question, and that the legislative authorization in this respect complied with the constitutional requirement that it should “provide the method for citing the State therein”, Art. 3, Sec. 35, La.Constitution.

. See also Milovich v. City of Los Angeles, 42 Cal.App.2d 364, 108 P.2d 960, where it was stated that for purposes of filing a claim against the city, the terms “board” and “department” were synonymous as applied to the “department” of water and power and the “board” of water commissioners of the city.

. The federal income tax rates shown at 26 U.S.C.A. §§ 1, 2 as applicable to the earnings of a married couple with one child, earning $10,800 per year ($800 per month), less exemption of $1,800 for dependents and $1,000 for personal deductions, leaving net taxable income of $8,000; is 20% on the first $4,000 and 22% on the balance, or an annual tax liability of $1,680 — i. e., of $140 per month.